JUDITH ANN HILDEBRAND, Plaintiff-Appellee, *v.* FRANKLIN LIFE IN-SURANCE COMPANY, Defendant-Appellant.

Fourth District   No. 4—82—0593

Opinion filed October 24, 1983.—Rehearing denied November 18, 1983.

Frederick H. Stone, of Franklin Life Insurance Company, of Springfield, and Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellant.

Dale A. Cini, of Ryan, Grabb, Cini & Bennett, of Mattoon, for appellee.

JUSTICE MILLER delivered the opinion of the court:

The plaintiff's son, Stephen Hildebrand, applied for a policy of life insurance with the defendant, gave the defendant's agent a check for the first month's premium, and received a conditional premium receipt in return; he died while his application was on its way to the defendant's home office. Aware of the death, the defendant investigated the applicant's answers to some questions on the application and learned that he had understated the number of his traffic convictions and license suspensions. Therefore, the defendant declined to issue the policy and denied coverage, relying on the provision in the conditional receipt that no insurance would issue unless the applicant were found by the defendant's underwriters to be an acceptable risk for the exact premium and policy applied for. The plaintiff, named as the beneficiary on the application, sued for and recovered the death benefit of the policy, $36,695. The defendant appeals, arguing that the terms of the conditional receipt entitle it to judgment as a matter of law, that the verdict was against the manifest weight of the evidence, and that the trial judge's incorrect rulings on evidence and instructions deprived it of a fair trial. We reverse and remand for a new trial.

The evidence presented at trial consisted mainly of what steps the defendant took in processing Stephen Hildebrand's application. The defendant also introduced the testimony of some competitors' underwriters, who said that their companies would have rated, *i.e.*, charged a premium higher than normal, or declined this application.

The plaintiff, Judith Ann Farrier, formerly Hildebrand, testified that at the time her son applied for the insurance policy, September 1979, he was living in Villa Grove and working for the Missouri-Pa-

cific Railroad Company. He was 20 years old and single and died about 9:30 p.m. September 27, 1979. Mrs. Farrier first learned of his application for insurance when a Mr. Davis of Franklin Life, the defendant, visited her in the middle of October 1979 and asked for permission to check her son's medical records. She later went through her son's papers and found the conditional premium receipt and the business card of Thomas K. Homma, one of the defendant's agents. The plaintiff telephoned Homma, who acknowledged selling the policy and said that she would have no problem collecting on it. About November 8, 1979, Mrs. Farrier telephoned Jerry Jourdan, a claims examiner, at the defendant's home office in Springfield, who said that because of her son's bad driving record, the company would never have issued the policy. Next, Mrs. Farrier received a letter dated November 13, 1979, from Richard Haines, the defendant's assistant claims director. Haines wrote:

> "Because of your son's death shortly after the application, we made an investigation into his insurability and secured a copy of the Illinois motor vehicle driving record. Based on the information in that report, our Underwriting Department has declined to issue the policy as applied for under our regular underwriting rules and standards."

Haines returned the premium check of $44.50, which the defendant had not cashed.

Over the defendant's objection, the plaintiff called and examined Thomas K. Homma as an adverse agent under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102). Homma testified that he first met Stephen Hildebrand September 20, 1979. On that day they talked about insurance and signed the necessary documents, but dated them a week later, September 27, because Hildebrand said that he would not have enough money in his bank account until then to cover the check for the initial premium. Homma accepted the application on a "non-medical" basis, meaning that Hildebrand did not have to take a physical examination.

Plaintiff's exhibit No. 8, the front side of the application, was filled out by Homma as he was talking with Hildebrand, and both signed it; the back side of the application is the "Agent's Confidential Report," which Homma filled out later and signed. Homma filled out an occupational questionnaire as he talked with Hildebrand, and both signed it. Finally, Homma wrote down Hildebrand's answers to the questions on the confidential-personal questionnaire, and both signed it. The third question on the confidential-personal questionnaire says, "List and describe driving convictions, including dates. Has license

been suspended or revoked?" Underneath that Homa wrote the following:

"3 MOS.—DEC 1978-MAR 1979
3—MOVING VIOLATIONS."

Homma told Hildebrand that a poor driving record could cause the application to be rated or declined. Hildebrand also signed a bank draft, allowing the defendant to obtain the monthly premiums directly from his account. Homma then left the conditional premium receipt with Hildebrand; like the other forms, the receipt was postdated September 27, 1979. Homma sent the application to John Jeffers, the defendant's area manager, who signed the confidential report. Homma denied telling Mrs. Farrier that she would be able to collect on the policy. Homma said that as of the trial date, the defendant had never declined because of a bad driving record a life policy written by him, though the defendant had declined for that reason policies written by other agents; some of Homma's policies had been rated for bad driving records.

John Jeffers testified for the plaintiff. Jeffers worked for the defendant from 1964 until May 1982, and he could not remember the defendant ever declining an application for a life insurance policy because of a bad driving record; the defendant had, however, rated applications for that reason.

Richard Haines, the assistant claims director for the defendant since 1971, was questioned as an adverse agent. Haines explained that when the defendant's home office received an application, it normally went to the underwriting department rather than to the claims department. In this case, however, the claims department got involved because Hildebrand had died. The claims department asked Equifax, an investigation company used by most insurance companies, to review some of the information on Hildebrand's application.

Jerry Jourdan also was questioned as an adverse agent. During the period in question, September 1979 through November 1979, Jourdan worked for the defendant as a claims examiner; at the time of trial he had a different job with the defendant. On September 28 Homma's wife telephoned with the information that Hildebrand had been killed and that his application was on its way to Springfield; Jourdan said that the application was received October 2, 1979, and he identified Defendant's exhibit No. 1A as the home office's file on the matter. Jourdan asked Equifax to obtain Hildebrand's medical history, which it did; the reports showed only minor things, such as treatment for a cut. Jourdan also asked Equifax to obtain a copy of Hildebrand's motor vehicle record (MVR), which it did.

Phillip Steele, since 1972 the defendant's assistant vice-president of underwriting, was questioned as an adverse agent. Steele said that the underwriting department did not become involved in this case until late October. The conditional premium receipt refers to "underwriting rules, limits and standards." Steele explained that the defendant does not have rules, that its limits are memorialized in various memos that have accumulated over the years, and that its standards are contained in the Life Underwriting Manual put out by the Lincoln National Life Insurance Company. The defendant was using this manual during the time it reviewed Stephen Hildebrand's application. Steele explained that Lincoln National provides reinsurance for the defendant; the two are not affiliated. All the defendant's underwriters had that manual, which was the only one used; the manual was advisory only, and the underwriters would consult it and then use their own judgment in handling applications. The manual contains what Steele called "a minimal reference" to driving records; this reference is in the list of "associated hazards" under the heading of alcohol; alcohol is discussed in the chapter on "nonphysical factors." Nothing in the manual says that a person whose license has been suspended should be rated or denied insurance.

Steele testified that after the application left the claims department, it went to the underwriting department. Steele was the first person in the underwriting department to review Hildebrand's application, and he did this October 29, 1979. Steele said that had Hildebrand not died, William McLaughlin, an underwriter, would have reviewed the application; McLaughlin never saw this application. The company decided to decline the application a few days later; according to Steele, the decision was based only on Hildebrand's driving record.

William Martin was the last of the defendant's employees to be questioned by the plaintiff as an adverse agent under section 2—1102. In autumn 1979 and at the time of trial Martin held the highest position in the defendant's underwriting department, vice-president. Martin said that Hildebrand's application was declined only because of the bad MVR. Had the application been accepted, the monthly premium would have been $44.50 and the death benefit $36,695. Martin repeated much of what Steele had said about the defendant's underwriting policies and the Lincoln National manual: in autumn 1979 the defendant did not have any written rules, limits, or standards dealing with applicants' driving records; the Lincoln National manual was used only as a guide, and each underwriter relied ultimately on his own judgment in deciding whether to rate or decline an application; the manual refers to driving records only once, and then in connection

with the use of alcohol; the defendant did not require underwriters to obtain an MVR for every applicant listing three moving violations.

Over the defendant's objection, Harlan Heller, a lawyer from Mattoon, testified that one may obtain the MVR of any driver licensed in Illinois simply by writing to the Secretary of State, who usually responds within the week.

The defendant presented six witnesses: three of its employees who had testified under section 2—1102—Haines, Steele, and Martin—and three underwriters for other insurance companies, who gave their opinions on Stephen Hildebrand's insurability.

Richard Haines, the defendant's assistant claims director, testified that for as long as he could remember, the claims department has had investigations done on applicants that die before their policies have been accepted or approved. The claims department relied on Equifax to get Hildebrand's MVR; because of their load of work, the department's employees do not have the time to do things like that themselves. Haines identified in the defendant's file on Hildebrand a memo of a telephone conversation that he had October 18, 1979, with someone in Equifax' Springfield office; Haines told that person to speed the investigation along. Haines said that once the investigation was finished, the matter went to the underwriting department, which made the decision to reject the application; Haines, assigned to the claims department, thus did not take part in that decision.

Phillip Steele, assistant vice-president of underwriting, examined the file on Hildebrand's application October 29, 1979. Steele said that a person with a bad driving record is more likely to die at an early age than a person with a good record; this is particularly true for unmarried males between the ages of 20 and 25. The MVR obtained by Equifax showed eight traffic convictions for which points were assigned, one completed suspension, and one impending suspension. The answer to the question about traffic violations on the personal-confidential questionnaire showed only three violations and the earlier suspension. Steele testified that when he reviewed the file he was aware of Hildebrand's death but that that did not influence him. He recommended rating the policy or declining it.

William Martin, the defendant's vice-president of underwriting, testified that the question on driving records was added to the personal-confidential questionnaire early in 1979, partly because many of the defendant's policyholders are young; even before that time, however, the underwriting department had considered applicants' driving records. Martin knew that Hildebrand had died but ignored that in making the decision to decline the policy. Martin testified that he was

sure that the defendant has rated or declined other life policies for unmarried, 20-year-old males with driving records similar to Hildebrand's; this was not an unusual case.

Over the plaintiff's objection, the defendant presented three underwriters for three other insurance companies; they testified that their companies would have rated or declined Hildebrand's application. Jerry Kownacki, since 1970 the director of underwriting and policy issuance for the Country Life Insurance Company, an affiliate of the Farm Bureau, testified that every underwriter uses a manual, commonly that of a reinsurer. Looking at Hildebrand's application and questionnaire, Kownacki said that his company would not have issued him a standard policy; without an MVR and other information, Kownacki could not tell whether the application would have been rated or declined. Kownacki was then handed Hildebrand's MVR. Kownacki explained that the underwriting manual used by his company assigns different numbers or points to different traffic convictions and illegal speeds and refuses to insure applicants whose records exceed a certain number of points. Because the MVR did not show Hildebrand's speeds when he was caught speeding, Kownacki could not say whether Country Life would have declined the application.

John Hindahl, vice-president of underwriting for the State Farm Life Insurance Company the last nine years, testified that State Farm considers an applicant's driving record in deciding whether to issue a policy and, if so, what type—standard or rated. After examining Hildebrand's application, personal-confidential questionnaire, and MVR, Hindahl concluded that State Farm would not have issued him a standard policy. Hildebrand was at the high end for rated policies under State Farm's point system for driving convictions; without knowing what speeds the speeding convictions were for or what type of vehicle they occurred in, Hindahl could not say whether Hildebrand was over State Farm's limit.

Frank Pieplow, the senior underwriting consultant for the Allstate Life Insurance Company, was the last witness. Pieplow said that in 1972 Allstate began asking applicants about their driving records. Allstate's underwriters used the Lincoln National manual as a supplement to their own company's manual. The information on Hildebrand's application and questionnaire would have caused Pieplow to obtain an MVR, and Hildebrand's MVR would have prevented him from getting the standard policy from Allstate. Pieplow testified that under Allstate's point system, Hildebrand's application probably would have been declined, considering his age, sex, and marital status.

I

The preliminary issue here is the meaning and effect of the conditional premium receipt that Stephen Hildebrand received in exchange for payment of the first month's premium. The front of the receipt bears this warning:

"CAUTION: No interim or temporary insurance coverage is afforded under the provisions of this receipt and no insurance will become effective prior to policy delivery and acceptance unless each and every condition specified in paragraph 'FIRST' on the reverse side is fulfilled exactly. No agent of the company and no broker is authorized to alter or waive any of these conditions."

The relevant provisions on the back side of the receipt say:

"FIRST. Conditions Under Which Insurance May Become Effective Prior to Policy Delivery and Acceptance. If each and every one of the following conditions have [sic] been fulfilled EXACTLY—(a) full initial premium must be paid, ***; (b) all medical examinations, ***; (c) the Proposed Insured, (and the Applicant if Payor Benefits are applied for) must be on the Effective Date, as defined below, a risk acceptable under the Company's underwriting rules, limits and standards for a policy EXACTLY as applied for without modification and at the rate of premium paid—then insurance as provided by the terms and conditions of the policy applied for and in use by the Company on the Effective Date but for an amount not exceeding that specified in paragraph 'SECOND' will become effective as of the Effective Date. 'Effective Date' as used herein means the latest of: (a) the date of application Part 1, or (b) the date of completion of all required medical examinations, ***, or (c) the date, if any, requested in the application."

In three succeeding paragraphs the receipt provides a limit of $200,000 on the amount of insurance that may become effective before the policy is delivered, provides that if the applicant fails to meet any of the conditions listed in the first paragraph, the company's only obligation is to return the initial premium, and provides that if the company makes a counteroffer, no insurance will become effective until the applicant receives and accepts the new policy and unless he is alive and insurable at that time.

■ Broadly speaking, there are three kinds of conditional receipts:

"(1) '[I]nsurable risk' or 'satisfaction' binders in which the document states that the proposed insurance takes effect at the

time of payment or of the physical examination, if it later appears that under objective standards of insurability the applicant was insurable at the date in question; (2) 'approval' binders in which no insurance comes into effect until the insurance is approved by an authorized official of the company; if it does, however, the effective date is that of the application or the medical examination; and (3) unconditional temporary insurance during the pendency of the application or for a stated period (rarely used in life insurance)." (*Simpson v. Prudential Insurance Co. of America* (1962), 227 Md. 393, 401-02, 177 A.2d 417, 422-23.)

The receipt here is of the "insurability" variety, for it purports to provide insurance from the effective date defined in the receipt if the company later determines that the applicant was a standard risk at that time.

■ Courts have often faced the question whether a conditional receipt provided life insurance coverage for an applicant who died before the company rejected his application. This question has three alternative answers:

"(1) giving retroactive as well as prospective effect to rejection, thus treating the application, notwithstanding the 'binder' as no more than an offer by the applicant; (2) giving no retroactive effect to a rejection, thus treating the binder as a contract of insurance during the interim; (3) giving effect to the rejection only where, on as objective a basis as possible, it is reasonable to say that the rejection is based on the circumstances which existed at the time of the application." (*American National Bank & Trust Co. v. Certain Underwriters at Lloyd's London* (7th Cir. 1971), 444 F.2d 640, 643.)

The plaintiff urges us to adopt the second alternative, interim insurance. That rule would compel the conclusion that Stephen Hildebrand was insured at the time of his death, for not until later did the defendant begin to review the application; at the least, a company cannot terminate interim insurance until it decides to reject the application, and perhaps other acts are necessary too (*Smith v. Westland Life Insurance Co.* (1975), 15 Cal. 3d 111, 539 P.2d 433, 123 Cal. Rptr. 649 (interim life insurance not terminated until the applicant receives both notice of the rejection and refund of his initial premium)).

Courts have found interim insurance under both insurability and approval receipts. (*E.g., Prudential Insurance Co. of America v. Lamme* (1967), 83 Nev. 146, 425 P.2d 346 (insurability receipt); *Gaunt v. John Hancock Mutual Life Insurance Co.* (2d Cir. 1947), 160 F.2d

599 (approval receipt).) Several related reasons, set out below, support the plaintiff's argument that conditional receipts provide interim insurance.

■■ (1) Ambiguous language: The ambiguity created by a receipt that suggests interim coverage but conditions that on the company's later approval or finding of insurability will be construed against the company, the drafter of the document. *Gaunt v. John Hancock Mutual Life Insurance Co.* (2d Cir. 1947), 160 F.2d 599, 602 ("insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion").

■■ (2) The applicant's reasonable expectations: The ordinary person expects that his coverage begins when he pays the initial premium and would be surprised to learn that the company may terminate it retroactively. (*Collister v. Nationwide Life Insurance Co.* (1978), 479 Pa. 579, 594, 388 A.2d 1346, 1353 ("regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents ***, the public has a right to expect that they will receive something of comparable value in return for the premium paid").) These expectations become more important—perhaps dispositive—if the policy and receipt are viewed as a contract of adhesion. *Allen v. Metropolitan Life Insurance Co.* (1965), 44 N.J. 294, 208 A.2d 638; *Collister.*

■■ (3) Benefits to the company of obtaining the initial premium with the application: An application for insurance is, by itself, merely an offer and revocable by the applicant until the company accepts it; having the applicant pay the first premium when he submits his application and giving him a receipt in return may contractually or practically commit him to the company and forestall a change of mind. (*Simpson v. Prudential Life Insurance Co. of America* (1962), 227 Md. 393, 177 A.2d 417.) The company also gains the early use of the premium, which it may invest. Providing applicants with interim coverage is a fair exchange for these benefits.

(4) Faults with the alternatives: If interim coverage is not imposed, then the receipt must be interpreted and enforced according to its terms. Dissatisfaction with literal interpretation takes different forms depending on the kind of receipt involved. In *Gaunt* Judge Learned Hand decried the illusion of coverage that is characteristic of "approval" receipts:

> "It does indeed some violence to the words not to make actual 'approval' always a condition, and to substitute a prospective approval, however inevitable, when the insured has died before

approval. But it does greater violence to make the insurance 'in force' only from the date of 'approval'; for the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money." (160 F.2d 599, 601-02.)

Some courts suspect that the coverage afforded by an "insurability" receipt is no less illusory. *Allen* said that finding interim coverage avoids "the serious impracticalities which would result from acceptance of the company's position that liability should turn on its good faith determination of insurability; these impracticalities are particularly evident where, as here, the company's Impairment Guide is not dispositive, no industry wide standards of insurability appear, and the company places its reliance on a judgment determination of uninsurability first made by its own medical director after he had knowledge of the applicant's death." (44 N.J. 294, 307, 208 A.2d 638, 645.) Although the applicant in *Allen* had received an "approval" rather than an "insurability" receipt, the company relied on its determination of uninsurability, not on a lack of approval.

These reasons do not receive equal emphasis in every decision on this question. To one court " 'the dynamics of the transaction viewed in its entirety' " are more important than the language of the conditional receipt (*Collister v. Nationwide Life Insurance Co.* (1978), 479 Pa. 579, 602, 388 A.2d 1346, 1354), while to another court interpretation rather than inequity forms the basis for finding interim insurance (*Gaunt v. John Hancock Mutual Life Insurance Co.* (2d Cir. 1947), 160 F.2d 599, 603 (Clark, J., concurring (preferring to base the result on inequity))).

The plaintiff invokes both interpretation and inequity in support of interim insurance. First, the plaintiff argues that the receipt given here is ambiguous, relying in part on the references in the application and conditional receipt to paying "on account of the first premium," "for full first premium," and "toward the first premium." The plaintiff cites *Goetze v. Franklin Life Insurance Co.* (1975), 26 Ill. App. 3d 104, 324 N.E.2d 437, where the company received as the first premium less than the amount necessary for the kind of coverage requested. The court found the conditional receipt ambiguous and held that the applicant was covered, despite the insufficient payment. Besides referring to "payment on account of the first premium" and "toward the first premium," the receipt in *Goetze* contained contra-

dictory provisions regarding payment of the first premium: first, the company would be bound only if full payment were made, but second, temporary insurance would be provided on a pro rata basis if less than full payment were made. The court construed the ambiguity against the company and found temporary coverage under the terms of the receipt.

The receipt given in this case does not contain a similar contradiction. The plaintiff also argues that the provision limiting the amount of insurance that may become effective before delivery of the policy creates an ambiguity. The limit, $200,000, is well above the amount that Stephen Hildebrand applied for and therefore could not have misled or confused him.

■■ ■ The plaintiff argues, apart from ambiguity, that denying interim insurance would be inequitable, frustrating the applicant's expectations and permitting the company to gain much more than it risked. The benefit to the applicant is not illusory, however, for full payment together with insurability provides temporary coverage under the terms of this receipt. We decline to follow the statement in *Gerrib v. Northwestern Mutual Life Insurance Co.* (1930), 256 Ill. App. 506, 523, that payment of the first premium, with a conditional receipt given in return, represents an offer by the applicant and nothing more. *Gerrib* apparently did not consider the possibility that a good-faith rejection for uninsurability could have retroactive effect— the only solutions considered by the court were interim insurance and delay of coverage until approval (*Rivota v. Fidelity & Guaranty Life Insurance Co.* (7th Cir. 1974), 497 F.2d 1225, 1229). The transaction here was more than an offer, for the conditional receipt provides that temporary insurance is in force if the conditions are met. The effective date of the coverage is the latest of the date of the application, the date requested in the application, and the date that all necessary medical examinations are completed. The effective date in this case would be September 27, 1979, which may be construed either as the date of the application or, because the documents were postdated, as the date requested in the application. No medical examination was necessary. Thus, if coverage began, it began September 27, 1979.

■ Without expressing a view on approval receipts and interim coverage, we conclude that an insurance company's good faith rejection of an applicant under an insurability receipt may have retroactive effect. This solution "fairly balances the applicant's interest in prompt protection, if available, against the insurer's interest in accepting only the risks which are insurable under its underwriting standards, gives some effect to all the terms used in the binder, and does not conflict

with past decisions of the Illinois courts." (*American National Bank & Trust Co. v. Certain Underwriters at Lloyd's London* (7th Cir. 1971), 444 F.2d 640, 644 (applying Illinois law; rejecting interim insurance).) The court reaffirmed this result in *Rivota*. We agree with the results reached by that court for the reasons stated.

## II

The defendant argues that Stephen Hildebrand was not a standard risk and therefore did not meet the requirement in the first paragraph of the conditional receipt that on the effective date he be "a risk acceptable under the Company's underwriting rules, limits and standards for a policy EXACTLY as applied for without modification and at the rate of premium paid ***."

The issue now becomes which party had the burden of proving that the applicant was or was not a standard risk and what proof was necessary. The jurors received the plaintiff's instructions on the issues in the case and the burden of proof. Plaintiff's instruction on the burden of proof required the plaintiff to prove that Stephen Hildebrand applied for the policy and paid the first premium, that he died before the defendant rejected his application, and that the defendant refused to pay the policy's benefits. The instruction then gave the defendant's defense—that Hildebrand was not an acceptable risk for the policy and premium applied for—and said that to prevail on this defense the defendant had to prove four things: First, that the defendant "acted on the application and notified the plaintiff of its decision without unreasonable delay"; second, that the defendant's underwriting rules, limits, and standards were ones that an ordinarily prudent person could expect to be used; third, that the defendant handled and reviewed the application "in essentially the same way" it would have handled and reviewed the application had Stephen Hildebrand not died; fourth, that the defendant acted reasonably and in good faith in deciding not to issue the policy. The plaintiff's instruction on issues presents the same propositions presented in the burden of proof instruction.

The defendant's proposed instruction on the burden of proof, which the trial court refused, said that the plaintiff had to prove that on September 27, 1979, and before his death, Stephen Hildebrand was an acceptable risk under the defendant's underwriting rules, limits, and standards for the policy applied for and at the rate of premium paid and that the defendant acted unreasonably in denying the application. This instruction did not require the defendant to prove anything. The defendant's instruction on issues, which the court also

refused, corresponds to its instruction on the burden of proof.

The defendant renews here its objections to the plaintiff's instructions, disputing both the assignment of the burdens and the elements listed as composing the company's defense.

## A

We conclude that the instructions correctly stated the plaintiff's burden and that the trial court was correct in requiring the defendant to prove that the applicant was not a standard risk. This is the company's affirmative defense.

The reasons for an insurance company's rejection of an application are entirely within its knowledge. Therefore, the company should have the burden of justifying its decision; the applicant or beneficiary should not have to prove that the decision was unjustified. In this case the ostensible reason for rejection was that Hildebrand's motor vehicle record failed to satisfy the company's underwriting rules, limits, and standards for the policy and premium applied for. The underwriting rules, limits, and standards are the company's, not the applicant's; the company and not the applicant uses them in the course of its business, and as a result the company and not the applicant acquires an actuarial experience and summary of the inevitable tragedies of human life. The company must therefore bear the burden of justifying its rejection of the application. See *Armstrong v. United Insurance Co. of America* (1981), 98 Ill. App. 3d 1132, 424 N.E.2d 1216 (*dictum*).

In other actions involving the question whether insurance is in force, the insurance company has the burden of proving that coverage does not exist. Under section 154 of the Illinois Insurance Code (Ill. Rev. Stat. 1981, ch. 73, par. 766), which provides the defense that a misrepresentation on a policy will void the policy if either it was made with the intent to deceive or it materially affects the risk, the insurer has the burden of proving the intent or the materiality (*Crest v. State Farm Mutual Automobile Insurance Co.* (1974), 20 Ill. App. 3d 382, 313 N.E.2d 679). Similarly, the insurance company has the burden of proving that a loss otherwise covered falls within the scope of an exclusion in a policy (*State Farm Mutual Automobile Insurance Co. v. Schmitt* (1981), 94 Ill. App. 3d 1062, 419 N.E.2d 601; *United States Fidelity & Guaranty Co. v. Brennan* (1980), 88 Ill. App. 3d 467, 410 N.E.2d 613). Here, as in those two instances, the individual believes that he is insured; he has entered into a contract, paid money, and expects something in return. The insurer's burden is to show why the expectation should be defeated.

## B

■■ We must next determine what the company must show and may rely on in proving its affirmative defense. The company's decision must be both objective and in good faith. Furthermore, the company must rely on its own underwriting rules, limits, and standards as the relevant measure of insurability. Finally, the specific reason for rejection must be one that the applicant could have reasonably expected, as disclosed, for example, by the questions asked him in applying for the policy. Limiting the legitimate reasons for rejection to ones that the applicant could have reasonably expected will help guarantee that the company makes its decision objectively and in good faith. *John Hancock Mutual Life Insurance Co. v. McNeill* (1976), 27 Ariz. App. 502, 556 P.2d 803.

■■ The conditional receipt at issue here provided temporary coverage if the applicant met the conditions specified. Death during this period is not a valid reason for refusing to issue the policy; by exchanging the conditional receipt for the initial premium, "the parties provided for the possibility that death might occur to an insurable applicant prior to the completion of the company's evaluation of the application." (*Rivota v. Fidelity & Guaranty Life Insurance Co.* (7th Cir. 1974), 497 F.2d 1225, 1227.) We conclude that the company may not base its decision on information uncovered by extraordinary investigations that would not have been undertaken if death had not occurred.

■■■ In connection with its discussion of the effect under Illinois law of a conditional receipt given to an applicant for life insurance who died before the company could issue the policy, *Rivota* said:

"In the normal rejection situation it may fairly be presumed that the company's determination was based upon insurability and acceptability, and as of the prior date. Where a significant intervening event does occur, however, a fair balancing of the competing interests requires that the insurer make some showing that its rejection was based solely upon considerations which are permissible under the terms of the receipt. *American National Bank & Trust Co. v. Certain Underwriters at Lloyd's London*, 7 Cir., 444 F.2d 640 (1971)." (497 F.2d 1225, 1228.)

The implication is that the "significant intervening event" may have influenced the company's decision. Thus, we conclude that the affirmative defense of uninsurability requires the company to show that its decision was objective, not subjective or arbitrary; the necessary standard of insurability will be supplied by the company's own underwriting rules, limits, and standards. (*Grandpre v. Northwestern Na-*

*tional Life Insurance Co.* (S.D. 1977), 261 N.W.2d 804.) A standard prevalent in the industry but not shared by the company in question is irrelevant to the company's defense, yet the plaintiff may introduce it if that evidence shows that the company's evidence of its own standard is improbable. (See *Simpson v. Prudential Insurance Co. of America* (1962), 227 Md. 393, 177 A.2d 417 (insurability receipt implies the existence of an objective standard of insurability; beneficiary must present *prima facie* case of insurability and may rely on general industry standards; insurer may rebut with proof of its own standards).) The company's control over its underwriting standards and its access to instant witnesses—its underwriters—entitle the plaintiff to present evidence of general underwriting standards for this limited purpose.

The infirmities in the plaintiff's definition of the defense are evident from what has been said. Although the plaintiff's instruction correctly required the defendant to prove Stephen Hildebrand's uninsurability, we agree with the defendant that the instruction incorrectly required it to prove certain propositions as elements of that defense.

■■ We must reject the proposition in the plaintiff's instruction that the defendant had to prove, as part of its defense, that its underwriting rules, limits, and standards were ones that an ordinarily prudent person could expect to be used. This element improperly subordinates the company's actuarial standards to those that an ordinarily prudent person would follow. It was error to instruct the jury on this, and so the instruction defining "ordinarily prudent person" was unnecessary. For the same reasons, the trial court erred in admitting, over the plaintiff's objections, the testimony of the underwriters from the other insurance companies. What their companies would have done with this particular application—or any other application for that matter—is irrelevant in proving the company's good faith and objective adherence to its own underwriting standards.

■■ ■ Two other propositions that the plaintiff would have the defendant prove in establishing its defense—the company's promptness and its regular handling and review of the application—are also not elements of the defense. The company's speed or delay in processing an application may be relevant but not as a necessary element of the defense, for the plaintiff has not sued for vexatious delay. The jury also should not have been instructed on the third element. Like delay, whether the defendant handled and reviewed Stephen Hildebrand's application the same way it would have had he not died may be circumstantial evidence that the company went to extraordinary lengths to avoid the loss. Expressed as an element in the in-

struction, however, this proposition may have led the jury to find for the plaintiff merely because the application was sent first to the company's claims department, where it would not have gone had Hildebrand not died—this would let variations from normal procedures defeat the company's affirmative defense as a matter of law, though they may be important in determining the company's good faith and reasonableness. The fourth proposition, the defendant's good faith, is an element of the defense and must be proved by the defendant.

Thus, the jury was correctly instructed that the defendant had the burden of proving that the applicant was not insurable for the policy and premium applied for, that is, that he was not a standard risk. Delay and variations from normal procedures may be the subject of evidence and argument offered by the plaintiff in response to the company's defense, but their opposites—promptness and normality—are not necessary elements of the affirmative defense. The actuarial expectations of an ordinarily prudent person are irrelevant at all stages.

### III

We cannot say that the defendant was entitled to judgment as a matter of law or that the judgment for the plaintiff must stand despite the erroneous instructions. The defendant argues that all the evidence shows that Hildebrand's driving record prohibited him from getting the policy and premium applied for. The defendant relies on the testimony of its employees, who said that they declined the application because of the driving record, and on the testimony of the underwriters from the three other insurers, who said that their companies would have rated or declined the risk.

We have held that the jury was correctly instructed that the defendant had the burden of justifying its decision. The evidence does not entitle the defendant to judgment as a matter of law. The plaintiff received a letter from the defendant saying, "Because of your son's death shortly after the application, we made an investigation into his insurability and secured a copy of the Illinois Motor Vehicle Driving Record." Besides obtaining the applicant's driving record, however, the company had also checked his medical history in this investigation, even though the application was taken on a nonmedical basis, no medical examination being required. This circumstantial evidence suggests that the defendant was casting about for reasons to avoid the policy. John Jeffers testified that during the 18 years he worked for the defendant, it had never declined an application for life insurance because of the applicant's driving record, though some applicants had been rated for that reason. Stephen Hildebrand's application was de-

clined.

All the persons who took part in the decision to decline the application were aware of Stephen Hildebrand's death. The jury may not have accepted their assertions that the death did not influence their decision.

■■ Finally, the defendant's evidence of what three competitors—Country Mutual, Allstate, and State Farm—would have done with Stephen Hildebrand's application was irrelevant and should not have been admitted. Those witnesses applied their own company's underwriting rules, limits, and standards, all of which assigned points to different kinds of traffic convictions. The defendant did not use a similarly objective scheme for assessing driving records. The defendant's underwriting manual contained only a minimal and irrelevant reference to driving records.

But we cannot say that the erroneous instructions did not produce the verdict. The jurors may have based their decision on one or more of the improper propositions that they were told were elements of the defendant's defense; the evidence is not so strongly in the plaintiff's favor that we may ignore these infirmities in the instructions.

IV

■■ The defendant raises some other arguments, which we shall deal with briefly. First, the defendant argues that because Thomas Homma was, at the time of trial, working as an agent for other insurance companies in addition to the defendant, he could not be examined as an adverse party or agent under section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102). The defendant cites *Yadro v. United States Fidelity & Guaranty Co.* (1955), 4 Ill. App. 2d 477, 124 N.E.2d 370, which affirmed the trial court's denial of the plaintiff's request to examine as an adverse agent an unaffiliated insurance broker that sold policies for various companies including the defendant there. The facts here are different. When Homma took the application he worked exclusively for the defendant and held the title of district manager; at the time of trial he was still one of the company's district managers, though he then was selling competitors' policies as well. Even if Homma's employment at the time he testified must determine his status as an adverse agent (but see *Frisch v. International Harvester Co.* (1975), 33 Ill. App. 3d 507, 338 N.E.2d 90 (plaintiff permitted to examine as adverse witness a person that quit working for the defendant the day before he testified)), we conclude that his connection with the defendant was sufficient. The plaintiff should be allowed to examine Homma as an adverse agent in

retrial, whatever his employment is then.

The defendant also argues that the trial court erred in permitting Harlan Heller to testify about the method he uses for obtaining drivers' traffic records from the Secretary of State; according to Heller, the information is usually received within a week of the request. By showing the length of time necessary, the testimony was relevant on the question whether the defendant delayed unreasonably its decision to deny the application for insurance, which goes to the question of good faith.

The defendant argues that the trial court erred in overruling its objections to certain questions asked of its employee Richard Haines. The plaintiff's questions concerned the handling of Hildebrand's application and were relevant.

The defendant argues that the trial court erred in not permitting the jury to receive a typewritten summary of Hildebrand's driving convictions in addition to the MVR; the summary was a decoded version of the MVR. The additional exhibit would have been repetitious, for the exhibit that the jurors saw contained the necessary code, which was self-explanatory.

The defendant renews the objections it made at trial to several additional instructions. One was on circumstantial evidence, and the defendant argues that all the evidence here was direct. We disagree. For example, the company's investigation of Stephen Hildebrand's medical records could be circumstantial evidence of the company's bad faith in trying to avoid the loss. Next, the verdict form signed by the jury referred to the amount of damages that the plaintiff would recover. We agree with the defendant that the amount of damages was not an issue here, but because of our result we need not decide whether the error is reversible. Finally, the jury was not instructed that its verdict had to be unanimous. The particular instruction used was Illinois Pattern Jury Instruction, Civil, No. 45.01 (2d ed. 1971); although that instruction does not explicitly mention unanimity, it does say that "[t]he verdict should be signed by each of you." All 12 jurors signed the verdict finding in the plaintiff's favor. If there was any question whether the verdict was unanimous, defense counsel could have polled the jury. He did not. Use of the instruction was not reversible error.

For the reasons indicated, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

Reversed and remanded.

WEBBER, P.J., and TRAPP, J., concur.