In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3570

JAMES RIVER INSURANCE COMPANY,

*Plaintiff-Appellant*,

*v.*

KEMPER CASUALTY INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4233—**Harry D. Leinenweber**, *Judge*.

ARGUED SEPTEMBER 24, 2009—DECIDED OCTOBER 28, 2009

Before POSNER, MANION, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. This diversity suit pits the James River insurance company against the Kemper insurance company. James River seeks a declaration that it had no duty to defend or indemnify two lawyers (and their law firm, but we can ignore that detail) who were sued for malpractice and whom Kemper had also insured. As is often true in a declaratory-judgment suit, the plaintiff in

the suit is really the defendant. For James River wants nothing from Kemper, while Kemper wants James River to contribute to the expense it incurred in defending the lawyers in the malpractice suit and in paying the settlement that ended the suit. The district court granted summary judgment in favor of Kemper.

Both insurance policies are "claims made" policies. That means they insure against liability based on legal claims against the insured filed during the period covered by the policy (the "policy period," as it is called), provided those claims are based on acts committed after the policy's "retroactive date." The policy period in the Kemper policy was September 27, 2000, to September 27, 2002, and the retroactive date was January 1, 1937. The policy period in the James River policy was November 8, 2004, to November 8, 2005, and the retroactive date was November 8, 2002. (The six-week gap between the end of Kemper's coverage and the beginning of James River's is immaterial.) The malpractice suit (the "claim") accused the lawyers of wrongful acts during both the period covered by Kemper's policy and the later period covered by James River's policy.

The lawyers had represented the wife in a divorce case. In December 1999, well within the coverage of Kemper's policy for acts giving rise to claims, the parties made a property settlement as a prelude to the entry of a divorce decree. The settlement gave the wife a big chunk of her soon-to-be ex-husband's employee stock options. But in February of the following year the employer wrote the parties that the method by which the

property settlement had tried to transfer the stock options was invalid. Two months later the insureds instituted on the ex-wife's behalf a proceeding in state court against her ex-husband, complaining of his failure to effectuate the transfer. The proceeding was pending when, in July 2001, his employer declared bankruptcy and the employee stock options evaporated.

The malpractice suit accused the lawyers of professional negligence in failing to get the stock options transferred before the bankruptcy rendered the options worthless. They could and should have done this, the suit charged, either by insisting that the property settlement (drafted by the husband's lawyer) use a proper method of conveyance, or by amending the settlement. Instead they had negligently decided to institute a legal proceeding that dragged on until the stock options became worthless.

The alleged misconduct occurred mainly during Kemper's policy period, but not entirely; the plaintiff alleged that it continued into 2003 (which was during the James River policy period), when the Illinois appellate court dismissed the proceeding to recover the options. The options were worthless by then, so it's hard to see how the ruling could have hurt the plaintiff. Its significance rather was in confirming the futility of the proceeding and thus reinforcing the claim that the lawyers should have been doing something else to recover the options, rather than just appealing their defeat in the trial court.

The malpractice suit further alleged that the defendants had concealed a business relationship that they had

with the husband's divorce lawyer. This charge also overlapped the coverage of the two polices, as did the further charge that the defendants had conspired to prevent the plaintiff from bringing the malpractice suit against her former lawyers until the statute of limitations had run.

James River points to several exclusions in its policy that it contends excuse it from having to pay for the lawyers' defense against the claim of wrongful acts committed during the James River policy period, or to pay any part of the settlement that resolved the malpractice suit. Kemper argues that James River has the burden of proving that the exclusions apply, and that is correct, but it is important to distinguish between two grounds for that placement of the burden.

The first ground is simply that James River is the plaintiff, and plaintiffs have the burden of proof except with respect to defenses. The second ground is based on insurance law. If the insureds (the lawyers) had been suing James River, it would have had the burden of proving that its insurance policy didn't cover any of the claims against them. That is the rule in Illinois. *Hildebrand v. Franklin Life Ins. Co.*, 455 N.E.2d 553, 564 (Ill. App. 1983); *Sokol & Co. v. Atlantic Mutual Ins. Co.*, 430 F.3d 417, 422-23 (7th Cir. 2005) (Illinois law). And the allocation of the burden of proof in a diversity case (or any other case governed by state law) is determined by state law. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20-21 (2000); *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959); *In re Stoecker*, 179 F.3d 546, 551-52 (7th Cir. 1999). At least this

is so when there is no direct conflict with a federal statute, or with a rule adopted under the Rules Enabling Act. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 747-58 (1980). The allocation of burden of proof (in the sense of burden of persuasion—which side loses a tie) absolutely determines the outcome in cases where the evidence is in equipoise, and by doing so advances the substantive policies of a state, cf. *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008); *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 364-65 (7th Cir. 1990), here a policy of favoring insureds in litigation with their insurance companies. *American States Ins. Co. v. Koloms*, 687 N.E.2d 72-75 (Ill. 1997); *Connecticut Specialty Ins. Co. v. Loop Paper Recycling, Inc.*, 824 N.E.2d 1125, 1130 (Ill. App. 2005). To apply a different rule in a diversity suit would make the happenstance of diversity provide a decisive advantage to one of the litigants if the evidence was evenly balanced.

This suit, however, is not between an insured and an insurance company, but between two insurance companies (the insureds were parties but are no longer), and the real plaintiff is Kemper, which is seeking a money judgment against James River. A plaintiff has the burden of proof, except with regard to affirmative defenses, and this should be the rule also for a declaratory-judgment defendant who is the real plaintiff, the declaratory-judgment action having been brought merely to accelerate the defendant's suit for damages or other relief. By seeking declaratory relief in lieu of simply balking at a demand for payment, an insurance company protects itself from being found to have refused the insured's demand in bad faith, a finding that would expose the company to having to pay punitive damages.

It is sensible to place the burden of proof of an affirmative defense on the defendant, rather than making the plaintiff prove a negative; and the sense of the rule is not diminished just because the "defendant" has made himself a "plaintiff" by filing a declaratory-judgment action rather than waiting to be sued. Lenience extended to insureds who find themselves in litigation with an insurance company has no place when the plaintiff in a suit against an insurer is another insurer. As explained in *Royal Indemnity Co. v. Wingate,* 353 F. Supp. 1002, 1004 (D. Md.), affirmed without opinion, 487 F.2d 1398 (4th Cir. 1973), in a declaratory-judgment action "the burden of proof should not be mechanically placed on the doorstep of the plaintiff simply because it is the one seeking relief . . . . [I]t would seem unwise to apply any general formulation with respect to the burden of proof but rather to address such a question from the standpoint of which party must lose where there is failure of proof."

Still, that approach, sensible as it seems, is not universally followed. 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2770, pp. 677-80 (3d ed. 1998). But is it law in Illinois? After we said in *International Hotel Co. v. Libbey*, 158 F.2d 717, 721 (7th Cir. 1946), though without explanation, that "when an issue of fact is tendered by the complaint and denied by the answer, the plaintiff must prove its complaint, even though it is a complaint for a declaratory judgment," the Supreme Court of Illinois, quoting this language from our opinion without any elaboration, said that this *was* the rule in Illinois. *Board of Trade of City of Chicago v. Dow Jones & Co.,*

456 N.E.2d 84, 87 (Ill. 1983). Neither case was an insurance case, but the "rule" was repeated in *Stoneridge Development Co. v. Essex Ins. Co.,* 888 N.E.2d 633, 650 (Ill. App. 2008).

How the state's supreme court would decide the question were it posed in an insurance case in which the pros and cons of the rule were argued, we do not know; but neither need we decide in order to resolve the present case. There are no issues of fact and therefore no reason for Kemper to have raised the question of the burden of proof. And anyway Illinois law treats exclusions in an insurance policy as affirmative defenses. *Raprager v. Allstate Ins. Co.*, 539 N.E.2d 787, 791-92 (Ill. App. 1989); *Wahls v. Aetna Life Ins. Co.*, 461 N.E.2d 466, 470 (Ill. App. 1983); *Illinois School Dist. Agency v. Pacific Ins. Co.*, 471 F.3d 714, 716-17 (7th Cir. 2006) (Illinois law). That is another example of a procedural rule that has a substantive motivation and therefore binds the federal courts in diversity suits.

James River bases its appeal mainly on a provision of its policy that excludes any claim "directly or indirectly arising from . . . any common fact, circumstances, transaction advice or decision involved in a 'professional service' reported as a claim or potential claim under any prior Policy." The lawyer defendants in the malpractice suit duly reported the malpractice claim to both insurers when the claim was filed in May 2005; and it is apparent that the wrongful acts alleged to have occurred during the James River policy period arose from the decisions that the insured lawyers had made during the Kemper policy period. Those were the decisions relating to their

efforts to obtain the stock options for their client both in the initial property settlement and after the husband's employer refused to transfer the options, contending that the method of transfer in the property settlement was invalid. The Illinois appellate ruling is the only wrongful act alleged to have occurred entirely during the later policy period (though we repeat our puzzlement that a judicial ruling could be an act of malpractice rather than at most evidence of malpractice by a lawyer handling the case in which the ruling was rendered), and it too arose from the lawyers' initial handling of the stock-options issue.

We mustn't press the concept of "arising from" too hard, however. What if the defendants in the malpractice suit, because their resources had been depleted by the suit, cut corners in handling an unrelated matter during James River's policy period and were sued for malpractice; would James River's prior-policy provision exclude coverage for that suit? It would not, because "arising from" implies a tighter connection than a mere "but for" cause creates. Maybe if Columbus hadn't discovered America the federal courts of appeals would not have been created in 1891; but it would be odd to say that the federal appellate judiciary "arose from" Columbus's voyages.

It is true that Illinois cases *say* that "arising from" is satisfied by a showing of "but for" causation. E.g., *American Economy Ins. Co. v. DePaul University*, 890 N.E.2d 582, 588 (Ill. App. 2008); *Shell Oil Co. v. AC&S, Inc.*, 649 N.E.2d 946, 951-52 (Ill. App. 1995). But what they mean is that a claim

need not have been foreseeable to be deemed to arise from an act by the insured. Illinois distinguishes between "but for" causation (which the cases call "cause in fact") and "legal cause," which means foreseeability. *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004); *Abrams v. City of Chicago*, 811 N.E.2d 670, 674-75 (Ill. 2004); *Majetich v. P.T. Ferro Construction Co.*, 906 N.E.2d 713, 717 (Ill. App. 2009); *Cleveland v. Rotman*, 297 F.3d 569, 573 (7th Cir. 2002) (Illinois law). If Illinois understood "but for" literally, to mean just a condition that had to exist for the event in question to occur (a subsequent act of malpractice, in this case), liability insurance companies would have no way of setting premiums equal to expected cost; they would be insuring against a range of possible claims so vast that an estimate of the probability that a claim within that range would actually be filed would be arbitrary.

The outer bounds of "but for" causation applied to insurance cases are suggested by the *American Economy* case, cited above. An office worker was injured by ultraviolet radiation from fluorescent lights installed by a contractor in her workplace. She had lupus, and it was the interaction of the radiation with her condition that caused the injuries; they would not have occurred, she claimed, had "commercially available and reasonably priced diffusers or filters that would diffuse or reduce the ultraviolet (UV) rays emitted by the fluorescent lights to a safe level" been installed. 890 N.E.2d at 585. It is understandable why in determining the scope of a liability-insurance policy a court would think it irrelevant whether the contractor should have foreseen

the presence of workers suffering from lupus or some other light-sensitive disease and taken precautions accordingly. For one doesn't purchase liability insurance just to protect oneself against being sued for inflicting foreseeable injuries; one buys protection against *any* claim arising from the potential liability-causing activity in which one engages, and a claim can arise from the activity without being foreseeable.

There are limits to what can be said to "arise from" some event. But they are not based on unforseeability. If Christopher Columbus had bought insurance against liability for claims arising out of his voyages and had later been sued for assaulting an Indian in Hispaniola, he could not have required the insurance company to defend him on the ground that had it not been for his voyage to Hispaniola he would not have assaulted anyone there.

A way to help partition liability between successive insurers, and thus decide when a claim made during the policy period of the second insurer should be deemed to arise out of activity during the policy period of the first insurer, is to ask what sense it would make for the defense of the malpractice suit, and the cost of the indemnification of the defendants in that suit, to be shared between two insurance companies. The suit against the insureds in this case alleged an intertwined set of wrongful acts that straddled the two policy periods. It wouldn't be feasible to apportion defense or settlement costs between acts committed in the two periods. Overlapping coverage, requiring apportionment of defense and indemnity costs between insurers, is sometimes unavoid-

able, see, e.g., *Outboard Marine Corp. v. Liberty Mutual Ins. Co.*, 670 N.E.2d 740, 757 (Ill. App. 1996), but there is no reason to manufacture occasions for such apportionment. As in *Continental Casualty Co. v. Coregis Ins. Co.*, 738 N.E.2d 509, 523 and n. 3 (Ill. App. 2000), it is apparent that the second insurer (James River) excluded coverage in situations in which the wrongful acts committed during its policy period were a continuation of wrongful acts committed during the policy period of the previous insurer—and they were.

But that does not end the case. The district court ruled that Kemper's policy was not a "prior Policy" within the meaning of the James River policy, and if that is right then the exclusion we've been discussing does not apply.

Kemper's policy grants the insured an "extended reporting period option": for a fixed fee, the insured can extend the period within which it is required to report a claim against it to Kemper. The claim must still have arisen from professional services rendered between the retroactive date of January 1, 1937, and the end of the policy period, which remember was September 27, 2002, but it can be reported later. The lawyers purchased a five-year extension, which therefore expired on September 27, 2007, well after the James River policy period, which ended in November 2005. (The malpractice suit was filed in 2005, but that was within the extended reporting period, which is why Kemper had to defend it and indemnify the insureds for the settlement with the plaintiff.) Therefore, the judge ruled, Kemper's policy was not "prior" to James River's.

The extended-reporting-period option (or "tail cover-age" as it is called) may seem a curious animal. It may seem that an insured would want such an option (for which he would have to pay Kemper $48,033, which was 225 percent of the regular annual premium of $21,348) only if he expected to be sued, and one would think that such an expectation would greatly increase the risk to the insurance company of incurring liability on the policy and thus the cost to the company of the additional coverage sought. The price of the extension of the reporting period seems, in those circumstances, awfully low, though typical of lawyers' professional liability policies. Michael Davidson, "Choosing the Right Tail Coverage," 19 *Experience* 34, 35 (2009); Bert Linder, "Lawyers Professional Liability Insurance Marketplace," 609 *PLI/Lit* 371, 427 (1999). The insurer is protected to a degree by the dollar limits on liability in the policy; yet because of the potential for adverse selection (that is, the purchase of insurance by persons who have an above-average likelihood of experiencing the insured-against event), such "'tail' coverage must be rated for the individual risk. The risk's [i.e., the insured's] history of insured exposures, previous types and amounts of insurance, the possibility of partial exhaustion of the aggregate limits, the amount and types of hazards relating to latent injury potential and the insured's previous loss history are among the many factors which may influence the price of the 'tail' coverage." James K. Killelea, "Format of Liability Insurance Policies," 296 *PLI/Lit* 229, 243 (1985).

In any event, the reporting period is not the policy period—Kemper's policy is explicit that a claim

reported in the extended reporting period must have arisen "prior to the end of the policy period." And nothing in the prior-policy exclusion in James River's policy limits the time within which a claim under a prior policy must be reported for the exclusion to apply.

James River cites two other exclusions. One is for a claim "directly or indirectly arising out of or resulting from any conspiracy" and the other a claim "directly or indirectly arising out of or resulting from any act committed with knowledge of its wrongful nature or with the intent to cause damage." The principal wrongful acts alleged against the insured lawyers in James River's policy period concern the conspiracy to prevent the client from filing a timely suit; and a claim of conspiracy is explicitly excluded. The negligent failure both to reveal the conflict of interest involving the husband's lawyer, and to accomplish the transfer of the stock options before the bankruptcy, is alleged to have continued until May 2003 (which was within the James River policy period), when the Illinois Appellate Court rejected the ex-wife's suit to obtain the promised options. The bankruptcy had occurred nearly two years before the appellate ruling, and after the bankruptcy the only further harm the lawyers could do their client was to cover up their negligence so that she wouldn't sue them. So only the negligent failure to disclose the conflict of interest could have harmed the client by delaying her suing them. But the alleged negligent failure persisted into James River's policy period and doesn't fall into the policy's conspiracy or wrongful-knowledge exclusions.

Nevertheless the prior-policy exclusion applies. The lawyers' alleged misconduct occurred within the policy period, and the suit was filed during the tail. Kemper's policy applies, and it therefore follows that James River's does not, since it excludes coverage of conduct covered by a prior insurer; all the wrongful acts alleged in the malpractice suit arose from events that took place in Kemper's policy period.

The judgment is reversed with instructions to enter the declaratory judgment requested by the plaintiff.

REVERSED WITH INSTRUCTIONS.