**MID–CONTINENT CASUALTY COMPANY, Appellant,**

v.

**SAFE TIRE DISPOSAL CORPORATION, et al., Appellees.**

No. 10–98–294–CV.

Court of Appeals of Texas, Waco.

March 22, 2000.

---

**6.** Because of our disposition, we need not address the third issue.

Kevin J. Cook, James C. Allums, Payne & Blanchard, L.L.P., Dallas, for appellant.

Lyndon F. Bittle, Cathy A. Lilford, Michael Prince, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, for appellee.

Before Chief Justice DAVIS Justice VANCE and Justice GRAY.

## O P I N I O N

REX D. DAVIS, Chief Justice.

Safe Tire Disposal Corporation of Texas and Safe Tire Disposal Corporation (collectively, "Safe Tire") filed suit against Mid–Continent Casualty Company seeking a declaratory judgment that Mid–Continent has a duty to defend Safe Tire under their insurance contract in three lawsuits brought by neighboring residents for damages allegedly suffered as a result of smoke from a fire on Safe Tire's premises. The trial court found that Mid–Continent has a duty to defend Safe Tire in the underlying lawsuits and awarded Safe Tire judgment for its attorney's fee and costs incurred in this declaratory judgment action and in the underlying lawsuits.

Mid–Continent claims in four issues that the court erred by: (1) finding that the pollution exclusion in the insurance policy does not apply to this case (two issues);

(2) awarding Safe Tire the costs and attorney's fees incurred in the underlying lawsuits; and (3) awarding Safe Tire the costs and attorney's fees incurred in this declaratory judgment action.

## BACKGROUND[1]

The Texas Natural Resource Conservation Commission designated Safe Tire as a waste tire processing facility in 1992. *See* Act of May 26, 1991, 72d Leg., R.S., ch. 303, § 1, 1991 Tex. Gen. Laws 1267, 1273, *amended by* Act of May 30, 1993, 73d Leg., R.S., ch. 899, § 3.01, 1993 Tex. Gen. Laws 3559, 3571 (formerly codified as Tex. Health & Safety Code Ann. § 361.471(4)).[2] As such, Safe Tire was permitted by the Commission as a facility "at which scrap tires are collected or deposited and shredded to facilitate the future extraction of useful materials for recycling, reuse, or energy recovery." *Id.* Safe Tire processes scrap tires by separating them into rubber chips and wire pieces which Safe Tire stores at its facilities for later distribution.

On December 1, 1995, an "accidental or unintended" fire broke out at Safe Tire's facilities. The fire began in a wire pile and spread to some piles of rubber chips. The fire was contained in these areas. Adjoining residents filed three separate suits against Safe Tire for damages allegedly sustained as a result of the fire. The petitions in these lawsuits each allege in pertinent part:

On December 1, 1995, a fire broke out at Defendants' Facilities, causing huge volumes of thick, black smoke to blanket the surrounding area. Many people [and much property], including [property owned [by]] plaintiffs, were subjected to offensive, noxious, toxic, and hazardous fumes, as well as high levels of particulate matter, by reason of having to breath the smoke from Defendants' fire. Many people, including plaintiffs herein, suffered damage and injury that was proximately caused by the inhalation and proximity to the smoke from Defendants' fire.[3]

. . . .

Because of Defendants' acts and/or negligence, Plaintiffs have been subjected to offensive, noxious, and/or dangerous odors, as well as toxic or hazardous chemicals and substances which have been released into the air in a wide area surrounding Defendants' facilities.

Mid–Continent insured Safe Tire under a general commercial liability policy which was in force and effect during the pertinent time period. The policy contains a pollution exclusion which provides in pertinent part that coverage is not provided for:

f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

---

1. The parties tried this case on an agreed statement of facts. *See* Tex.R. Civ. P. 263.

2. Chapter 361, subchapter P (sections 361.471—361.499) of the Health and Safety Code, which was entitled "Waste Tire Recycling Program," expired on December 31, 1997. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 317, § 23, 1995 Tex. Gen. Laws 2723, 2733.

3. One of the petitions varies to some degree in describing the source of the plaintiffs' claims. The bracketed portions reflect variants in wording which appear in this petition. The last sentence of the quoted paragraph in this petition reads, "Many people, including plaintiffs herein, suffered damage and injury that was proximately caused by the smoke from Defendants' fire."

.... [4]

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

....

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Safe Tire gave Mid–Continent timely notice of the underlying lawsuits and asked Mid–Continent to defend it under the policy. Mid–Continent has denied coverage and refuses to defend Safe Tire because of its position that the pollution exclusion relieves it of its duty to provide coverage for or defend against any of the lawsuits.

## APPLICABLE LAW

The Supreme Court has established the following test for determining whether an insurance company has a duty to defend its insured in a particular case:

[U]nder the "complaint allegation rule," factual allegations in the pleadings and the policy language determine an insurer's duty to defend. *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 847–48 (Tex.1994). "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Id.* at 848.

*Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex.1997); *accord National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997).

■ Texas courts sometimes refer to the "complaint allegation" rule as the "eight corners" rule. *See National Union Fire Ins. Co.*, 939 S.W.2d at 141. When we apply this rule, we give a liberal interpretation to the allegations of the petition. *Id.* We "focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged." *Id.* (quoting lower court's decision, 919 S.W.2d 903, 905 (Tex.App.—Eastland 1996)).

Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in insured's favor.

*Id.* (quoting *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex.1965)).

■ The exception to this general rule occurs "[w]hen the petition in the underlying lawsuit does not allege facts sufficient for a determination of whether those facts, even if true, are covered by the policy." *State Farm Fire & Cas. Co. v. Wade*, 827 S.W.2d 448, 452 (Tex.App.—Corpus Christi 1992, writ denied); *accord Gonzales v. American States Ins. Co.*, 628 S.W.2d 184, 186 (Tex.App.—Corpus Christi 1982, no writ). In this circumstance, "the evidence adduced at the trial in a declaratory judgment action may be considered along with the allegations in the underlying petition." *State Farm Fire & Cas. Co.*, 827 S.W.2d at 452; *accord Gonzales*, 628 S.W.2d at 186.

## SUBDIVISION (a) OF THE POLLUTION EXCLUSION

■ Mid–Continent contends in its second issue that subdivision (a) of the pollu-

---

**4.** Mid–Continent does not contend that subdivision (c) or (d) of the pollution exclusion applies in this case. Accordingly, we do not address these provisions.

tion exclusion applies to the claims brought in the underlying lawsuits. Safe Tire responds that the hostile fire exception to subdivision (a) applies.

The policy plainly defines "pollutants" to include "smoke." Subdivision (a) excludes from coverage any bodily injury or property damage caused by the discharge of pollutants "from any premises ... owned or occupied by ... [the] insured." This subdivision does not apply, however, "to 'bodily injury' or 'property damage' arising out of heat, smoke or fumes arising from a hostile fire." Under this exception, "a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be."

The petitions in the underlying suits each allege that the claims for damages therein are due to a fire which "broke out" at Safe Tire's facilities. The evidence adduced at trial reflects that the fire was "unintended." The fire began in a wire pile, spread to some piles of rubber chips, and was contained in these areas.

Mid–Continent argues that under the terms of the policy a hostile fire occurs only when a "friendly" fire (*i.e.*, one intentionally set in an appropriate place) "gets out of control or breaks out from where it ought to be." Mid–Continent relies on settled case law holding that a fire insurance policy covers only losses due to a "hostile" fire rather than a "friendly" fire. *See, e.g., Reliance Ins. Co. v. Naman,* 118 Tex. 21, 25–26, 6 S.W.2d 743, 744 (1928); *Garfield Mut. Fire & Storm Ins. Ass'n v. Calhoun,* 532 S.W.2d 663, 666 (Tex.Civ. App.—Corpus Christi 1975, no writ); *City of New York Ins. Co. v. Gugenheim,* 7 S.W.2d 588, 589 (Tex.Civ.App.—Waco 1928, no writ). Thus, in Mid–Continent's view, the hostile fire exception will apply only if Safe Tire intentionally sets a controlled fire in an appropriate location on its

premises which becomes uncontrollable or breaks out from its place of origin.

Safe Tire responds that the term "hostile fire" includes any "accidental" or "unintended" fire. *See, e.g., North British & Mercantile Ins. Co. v. Arnold,* 171 S.W.2d 215, 217 (Tex.Civ.App.—Galveston 1943, no writ); *Maffei v. Northern Ins. Co.,* 12 F.3d 892, 898 (9th Cir.1993). *Webster's* defines "uncontrollable" in part as "free from control by a superior power." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1286 (10th ed.1993). *Webster's* defines the verb "control" in part: "to exercise restraining or directing influence over: regulate." *Id.* at 252. These definitions tend to support Safe Tire's interpretation of the term "hostile fire" because an accidental or unintended fire would be one which is not restrained, directed or regulated by someone.

■ Although the Court believes Safe Tire's interpretation of the term "hostile fire" to be more reasonable, the parties have, at a minimum, provided competing reasonable definitions for that term. When an exclusion in "an insurance contract is subject to more than one reasonable interpretation, the contract is ambiguous and the interpretation that most favors coverage for the insured will be adopted." [5] *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997); *accord Kelly Assocs., Ltd. v. Aetna Casualty & Sur. Co.,* 681 S.W.2d 593, 596 (Tex.1984). Accordingly, we adopt Safe Tire's interpretation.

The fire which forms the basis of the underlying suits was a "hostile fire" under the terms of the policy. Therefore, the exclusion of subdivision (a) does not apply. Accordingly, we overrule Mid–Continent's second issue.

### SUBDIVISION (b) OF THE POLLUTION EXCLUSION

■ Mid–Continent argues in its first issue that subdivision (b) of the pollution

---

**5.** We note, however, that an ambiguity does not arise solely from the fact that the parties offer conflicting interpretations of the provision at issue. *Kelley–Coppedge, Inc. v. High-* *lands Ins. Co.,* 980 S.W.2d 462, 465 (Tex. 1998); *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997).

exclusion applies to this case. Specifically, Mid–Continent contends that, because Safe Tire is in the business of processing statutorily-defined "waste" tires, its facilities necessarily fall within the subdivision (b) exclusion for pollutants dispersed from a "site or location" used for the "processing" of "waste." Mid–Continent also relies on a dictionary definition of "waste" which defines the term in part as "refuse," which is itself defined in part as "the worthless or useless part of something." Safe Tire responds that the statutory definition of "waste" does not necessarily equate with the policy definition of the term and that adopting Mid–Continent's interpretation would render the "hostile fire" exception previously discussed meaningless.

■■■ We do not consider a statutory definition for a term in an insurance policy when construing that term unless the statute "bear[s] on the subject matter of insurance contracts or . . . define[s] the rights and liabilities of parties to such contracts." *Carroll v. Universal Underwriters Ins. Co.*, 613 S.W.2d 815, 817 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.); *accord Howard v. INA County Mut. Ins. Co.*, 933 S.W.2d 212, 219 (Tex.App.—Dallas 1996, writ denied). In this case, the former Waste Tire Recycling Program statutes (chapter 361, subchapter P of the Health & Safety Code) do not relate to "the subject matter of insurance contracts" or "define the rights and liabilities of parties to such contracts." *See id.* Accordingly, we do not consider the statutory definitions contained therein when construing the term in question. *Id.*

The plaintiffs in each of the underlying suits allege in pertinent part that Safe Tire is "engaged in the treatment, processing, storage, and/or disposal of used automobile tires." *Webster's* defines "waste" in part:

> 4. a (2): scrap (3): an unwanted byproduct of a manufacturing process . . .

> b refuse from places of human or animal habitation: as (1): garbage, rubbish.

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 1333. According to *Webster's*, a "byproduct" is "something produced in a usu[ual] industrial or biological process in addition to the principal product." *Id.* at 157. As Mid–Continent argues, "refuse" is defined in part as "the worthless or useless part of something." *Id.* at 984. *Webster's* defines "garbage" in part as "unwanted or useless material." *Id.* at 480. "Rubbish" is similarly defined in part as "useless waste or rejected matter." *Id.* at 1022. Thus, from the dictionary, two primary definitions of the term "waste" can be found: (1) an industrial byproduct; and (2) that which is useless or has been rejected.

Mid–Continent takes the position that "used" tires fall within the latter category. It places primary reliance on *Kruger Commodities, Inc. v. United States Fidelity & Guar.* to support its argument. 923 F.Supp. 1474 (M.D.Ala.1996). *Kruger* involved a rendering plant "which processed used cooking oils and animal carcasses." *Id.* at 1476. The court determined under Nebraska law that odors produced by the processing of animal carcasses during normal plant operations were "pollutants" because Kruger was in the business of processing waste. *Id.* at 1479–80.

*Kruger* may be distinguished for several reasons. The court determined that the odors in question were pollutants under subdivision (c) of a policy identical in all pertinent respects to the policy in this case.[6] *See id.* Mid–Continent does not argue that subdivision (c) applies in the present case.

The pollutants in *Kruger* were the offensive odors released from the rendering plant as a result of the processing of animal carcasses, not the carcasses themselves. *Id.* at 1476. Subdivision (c) defines "pollutants" "which are or were at

---

6. Subdivision (c) of the *Kruger* policy, like the one in this case, excludes coverage for injuries or damages caused by pollutants "which are or were at any time transported, handled, stored[,] treated, disposed of, or processed as waste." *See Kruger Commodities, Inc. v. United States Fidelity & Guar.*, 923 F.Supp. 1474, 1477 (M.D.Ala.1996).

any time ... disposed of or processed as waste." Thus, the odors released from the Kruger plant were pollutants covered by the exclusion because they were disposed of by the plant as a by-product of the rendering process and not because Kruger was in the business of processing "waste" products. *See, e.g., Hydro Systems, Inc. v. Continental Ins. Co.,* 929 F.2d 472, 473 (9th Cir.1991) (gas released during manufacturing process); *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.,* 905 F.2d 954, 955 (6th Cir.1990) (smoke, gas, etc. released from iron briquetting plant); *Tri–Municipal Sewer Comm'n v. Continental Ins. Co.,* 223 A.D.2d, 639, 639, 636 N.Y.S.2d 856, 857 (1996) (odors emanating from sewage treatment plant); *City of Bremerton v. Harbor Ins. Co.,* 92 Wash. App. 17, 18, 963 P.2d 194, 195 (1998) (same).

It could likewise be argued that the odors in *Kruger* constituted pollutants under subdivision (b) of the policy because they were released from premises in which Kruger was processing a "waste" product. Applying such an interpretation to the instant case, the smoke released from Safe Tire's premises could arguably be considered a pollutant under subdivision (b) because it was released from a facility which is in the business of processing "waste" tires. However, we have already determined that we will not consider the statutory definition of "waste" tires when construing the term "waste" in the policy.

 In addition, were we to apply such a definition in this case, it would render the hostile fire exception to subdivision (a) previously discussed meaningless. When we construe exclusions in an insurance policy, we must "attempt to give effect to all contract provisions so that none will be rendered meaningless." *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998); *accord Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1998); *see also American Star Ins. Co. v. Grice,* 121 Wash.2d 869, 877–78, 854 P.2d 622, 627 (1993) (refusing

to construe pollution exclusion in nearly identical fact scenario in such a manner as to render hostile fire exception meaningless). Following this principle, we decline to construe subdivision (b) as applying automatically to any insured entity in the business of processing consumer waste materials.

 Rather, we construe this provision to apply to pollutants released "from any premises, site or location which is or was at any time used by or for [Safe Tire] or others for the handling, storage, disposal, processing or treatment of [unwanted byproducts]" produced during the processing of used tires at Safe Tire's facilities. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 1333. The rubber chips and wire from which the fire in this case originated are the desired products of the tire-recycling process. Thus, they do not constitute "waste" under the policy. *See id.* Therefore, the exclusion of subdivision (b) does not apply. Accordingly, we overrule Mid–Continent's first issue.

## COSTS AND ATTORNEY'S FEES

Mid–Continent contends in its third and fourth issues that the court erred by awarding Safe Tire the costs and attorney's fees incurred in the underlying lawsuits and the costs and attorney's fees incurred in this declaratory judgment action. Mid–Continent premises these issues on its contentions that the pollution exclusions discussed above "exclude coverage and therefore the duty to defend." However, we have determined that the exclusions do not apply in this case. Therefore, Mid–Continent does have a duty to defend Safe Tire in the underlying lawsuits. Accordingly, we overrule Mid–Continent's third and fourth issues.

We affirm the judgment.

TOM GRAY, Justice, dissenting.

The question in this appeal is whether damage alleged to have occurred as a result of a fire at the plant of a tire recycling

company is covered by an insurance policy. The majority, after analyzing the policy and an extensive discussion of the definition of "waste," construes the policy to provide coverage to the damages as alleged. Because the policy contains a "definition" of "waste" by reference to what is included within the meaning of the term which is contrary to the interpretation of the term as construed by the majority, I respectfully dissent.

Safe Tire is in the business of processing tires. They are designated by the Texas Natural Resource Conservation Commission as a waste tire processing facility. Their business is to operate "a facility 'at which scrap tires are collected or deposited and shredded to facilitate the future extraction of useful materials for recycling, reuse, or energy recovery.' ... Safe Tire processes scrap tires by separating them into rubber chips and wire pieces which Safe Tire stores at its facilities for later distribution." *Mid–Continent Casualty Company v. Safe Tire Disposal Corporation*, 16 S.W.3d 418, 420 (Tex.App.—Waco, 2000).

It is undisputed that a fire began in one of the wire piles and spread to the piles of rubber chips. It is the smoke from this fire that resulted in alleged damages to area businesses, property and individuals. Various lawsuits were filed against Safe Tire. Safe Tire notified Mid–Continent to provide a defense and coverage. Mid–Continent responded that they were not liable because the insurance policy excluded coverage.

The clause in the insurance contract in dispute is referred to as a pollution exclusion clause. The pollution exclusion clause states that the policy does not provide coverage for:

I. 2. f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

\* \* \*

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

.

\* \* \*

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

\* \* \*

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

The wire pieces and rubber chips that caught fire and burned were "to be recycled, reconditioned or reclaimed" within the meaning and terms of the pollution exclusion clause of the policy.[1] There is no need to look outside the policy for a definition of waste. As a facility recognized by the Texas Natural Resource Conservation

---

1. The majority redefines the term waste, as used in the policy, to be "unwanted by-products" and states that because the wire pieces and rubber chips were the desired products of shredding the tires they are not waste. It is undisputed that the wire pieces and rubber chips were to be recycled, reconditioned or reclaimed. Safe Tire wants the definition of waste contained in the policy to be limited to the use of the term in the definition of pollutants and thus construes it to also require it to be a thermal irritant or contaminant. We should not so limit our analysis. When waste is defined in the policy by reference to what is included in the meaning of the term, we are obligated to use those inclusive terms each time the defined term is used. In this policy that means the descriptive terms should be used in the clause describing sites for which no coverage is provided, not just in the definition of pollutants. The level of indention of the definition likewise indicates the definition of waste in the policy should be applied for each use of the term in the entire subsection.

Commission as a waste tire processing facility, Safe Tire should not be surprised nor heard to complain that a Commercial General Liability insurance policy which contains a pollution exclusion clause denies coverage of a site from which waste might pollute neighboring property and cause damage.

A possibly confusing aspect of the analysis is a determination of whether the pollution exclusion applies because the pollution which was dispersed, migrated, released or escaped from the location was in the form of smoke, vapor, soot and fumes and not in the form of the actual waste products, in this case wire pieces and rubbers chips. It was not the waste directly, but the burning of the waste, that resulted in the alleged damages. Thus we must look to the terms of the policy to see how it applies to these facts.

The pollution exclusion clause at issue, I. 2. f.(1)(b), provides that there is no insurance if the escape of pollutants is from a premises, site or location where waste was stored or processed. However, the hostile fire clause (quoted above) provides coverage if the damages are from a hostile fire even though the damage is the result of what would otherwise be a pollutant, i.e. smoke, soot, etc. Thus, the hostile fire clause operates as an exception to the pollution exclusion clause. However, the hostile fire exception does not cover a fire at an excluded site. Because the site where the wire pieces and rubber chips were stored is a site excluded by the pollution exclusion clause, the damages alleged to have resulted from a fire at the excluded site are clearly not covered.

Safe Tire responds and the majority concludes that the policy provides no coverage and is meaningless if it does not cover this fire. Not true. If the administrative building had burned, instead of the piles of waste (at the site where they were stored), and the same type claims had been made against Safe Tire, there is little doubt that the claims would be covered by the terms of the policy. Additionally, fire was not the only risk insured against by the terms of the policy.

When the location at which the fire occurred is so clearly a place where waste, as described in the policy, was stored, and is therefore excluded from coverage under the express terms of the policy, Mid–Continent had no duty to defend the claims, much less provide coverage, for the alleged damages.

This is not unlike a petition which clearly describes a car which the owner did not include on an automobile policy. After the car is involved in a wreck, the owner says, "Well I have another car that was not listed on the policy. But I do have an automobile insurance policy with your company. You have a duty to defend me and pay any damages, even though the premiums you charged me did not include coverage for the car involved in the wreck." The result in this case should be equally obvious.

Based upon the foregoing analysis, I would reverse the declaratory judgment and render judgment that the pollution exclusion in the policy excludes coverage and the duty to defend claims which resulted from a fire at a site where piles of wire pieces and rubber chips that were to be recycled, reconditioned or reclaimed were stored.