CONNECTICUT SPECIALTY INSURANCE COMPANY, Plaintiff-Appellee, v. LOOP PAPER RECYCLING, INC., Defendant-Appellant (Anjanette Howard *et al.*, Indiv. and On Behalf of All Others Similarly Situated, Defendants).

First District (4th Division)    No. 1—03—2988

Opinion filed February 17, 2005.

Leahy, Eisenberg & Fraenkel, Ltd., of Chicago (Thomas J. Finn and Shannon F. O'Shea, of counsel), for appellant.

Williams, Montgomery & John, Ltd., of Chicago (Mary A. Sliwinski, Alyssa M. Campbell, and Lloyd E. Williams, Jr., of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

Loop Paper Recycling, Inc. (Loop Paper Recycling), appeals from the judgment of the circuit court which found that Connecticut Specialty Insurance Company (Connecticut) owed no duty to defend it in a lawsuit arising out of a fire at its facility in Riverdale, Illinois. Connecticut had issued a general commercial liability policy under which Loop Paper Recycling was a named insured. Specifically, the court determined that (1) the policy's "total pollution exclusion" barred coverage for bodily injury claims because the Riverdale facility was engaged in the handling, storage, disposal, processing or treat-

ment of waste; (2) the underlying complaint did not allege "personal injury" as defined by the policy; and (3) even if the underlying complaint had alleged "personal injury," the policy's "absolute pollution exclusion" barred coverage. On appeal, Loop Paper Recycling argues that the circuit court erred in finding no duty on the part of Connecticut to defend.

## BACKGROUND

On or about July 16, 2000, vandals set fire to an unknown amount of cardboard that was located at Loop Paper Recycling's Riverdale facility. The resulting fire burned for several days, sending clouds of smoke and toxic substances into the surrounding neighborhood. On August 17, 2001, residents of that neighborhood (underlying plaintiffs) filed suit against Loop Paper Recycling, asserting claims for strict liability and negligence.

In their complaint, the underlying plaintiffs alleged that "Loop Paper Recycling owns, operates, and manages various paper recycling facilities." One of Loop Paper Recycling's facilities, known as the Suburban Warehouse, was located at 13050 State Street in the City of Riverdale, Cook County, Illinois. Per the underlying plaintiffs' complaint, Loop Paper Recycling's business operations at the Riverdale facility allegedly consisted of "gathering, holding, storing, handling, baling, packaging, shipping and transporting cardboard." According to their complaint, "cardboard commonly utilized and obtained for recycling contains additives, adhesives, bonding material, and/or other fixatives as well as vinyl chloride, urea, melamine, phenol formaldehyde, urethanes, and acrylics and other substances and on information and belief, the cardboard present at the Defendant, Loop Paper [Recycling's] facility did contain such materials."

The underlying plaintiffs alleged that when the cardboard containing these materials was ignited, the resulting smoke released "into the air the fixatives and substances so as to cause highly toxic and hazardous" pollution. Thus, as a direct and proximate result of the fire at Loop Paper Recycling's Riverdale facility, the underlying plaintiffs alleged that they were exposed to the hazardous and toxic substances. They sought damages for "medical diagnosis, testing, and monitoring to determine the impact of the toxic substances that they were exposed to as a result of the aforementioned release."

On January 15, 2001, Loop Paper Recycling tendered its defense in the underlying lawsuit to Connecticut. On May 21, 2001, Connecticut agreed to defend Loop Paper Recycling, but reserved its right to deny coverage.

The policy provided for three types of coverage: (1) "Coverage A"

for bodily injury and property damage liability; (2) "Coverage B" for personal and advertising injury liability; and (3) "Coverage C" for medical payment claims. Under Coverage A, the policy stated, in relevant part:

"[*Bodily Injury and Property Damage*]

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.

\* \* \*

b. This insurance applies to 'bodily injury' and 'property damage' only if:

A. The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and

B. The 'bodily injury' or 'property damage' occurs during the policy period."

Within Coverage A, the policy contained a "total pollution exclusion," which stated that the insurance did not apply to the following:

"[*Total Pollution Exclusion to Coverage A*]

f. Pollution

(1) 'Bodily injury' or 'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. This exclusion does not apply to 'bodily injury' or 'property damage' arising out of heat, smoke or fumes from a hostile fire unless that hostile fire occurred or originated:

(a) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(b) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, pollutants.

\* \* \*

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

\* \* \*

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed."

Coverage B stated, in pertinent part:

"[*Personal and Advertising Injury*]

Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies.

b. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal injury' or 'advertising injury' to which this insurance does not apply."

Coverage B contained an "absolute pollution exclusion," which stated:

"[*Absolute Pollution Exclusion to Coverage B*]

2. Exclusions

This insurance does not apply to:

a. 'Personal injury' or 'advertising injury;'

✻ ✻ ✻

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

✻ ✻ ✻

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

On September 28, 2001, Connecticut filed a complaint for declaratory judgment, arguing that, under the terms of the policy, it owed no duty to defend or provide coverage to Loop Paper Recycling in the lawsuit filed by the underlying plaintiffs. The circuit court granted Connecticut's motion for summary judgment, finding that while the underlying plaintiffs sufficiently alleged that they suffered "bodily injury" as defined in the policy, there was no coverage under the policy's "total pollution exclusion." The court also found that the underlying plaintiffs failed to allege "personal injury" and that, even if they did, the "absolute pollution exclusion" barred coverage. Loop Paper Recycling filed a timely notice of appeal.

## ANALYSIS

Summary judgment is appropriate when the pleadings, deposi-

tions, admissions, and affidavits on file reveal that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Chatham Corp. v. Dann Insurance*, 351 Ill. App. 3d 353, 358, 812 N.E.2d 483, 488 (2004). When ruling on a motion for summary judgment, we must construe all evidence in the light most favorable to the nonmoving party. See *Sears, Roebuck & Co. v. Acceptance Insurance Co.*, 342 Ill. App. 3d 167, 171, 793 N.E.2d 736 (2003). We review a trial court's grant of summary judgment *de novo*. *Sears*, 342 Ill. App. 3d at 171.

■ The duty of an insurer to defend its insured is much broader than its duty to indemnify. *Sears*, 342 Ill. App. 3d at 171. When determining whether an insurer has a duty to defend its insured, the court must compare the allegations contained in the underlying complaint to the relevant provisions of the insurance policy. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479, 687 N.E.2d 72 (1997).

In determining whether an insurer owes a duty to defend an action brought against its insured, the court must consider only the allegations in the underlying complaint and the relevant policy provisions. *Lexmark International, Inc. v. Transportation Insurance Co.*, 327 Ill. App. 3d 128, 136, 761 N.E.2d 1214 (2001), quoting *Bituminous Casualty Corp. v. Fulkerson*, 212 Ill. App. 3d 556, 562, 571 N.E.2d 256 (1991). "[W]here summary judgment is sought in the context of a declaratory judgment action to determine whether an insurer has a duty to defend, the use of extrinsic evidence is inappropriate." *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 567, 734 N.E.2d 50 (2000).

If the court determines that the allegations fall within, or potentially within, coverage under the policy, the insurer has a duty to defend the insured against the underlying complaint. *Progressive Universal Insurance Co. of Illinois v. Liberty Mutual Fire Insurance Co.*, 347 Ill. App. 3d 411, 414, 806 N.E.2d 1224 (2004). Insurance policies are to be liberally construed in favor of coverage, and where an ambiguity exists in the terms of the contract, the ambiguity will be resolved in favor of the insured and against the insurer. *Traveler's Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 293, 757 N.E.2d 481 (2001). The insurer bears the burden of establishing that a claim falls within a provision that limits or excludes coverage. *Progressive Universal*, 347 Ill. App. 3d at 414.

When construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement. *Central Illinois Light Co. v. Home Insurance Co.*, 342 Ill. App. 3d 940, 950-51, 795 N.E.2d 412 (2003). A court

must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Koloms*, 177 Ill. 2d at 479. If the words of a policy are clear and unambiguous, they must be afforded their plain, ordinary and popular meaning. *Traveler's Insurance Co.*, 197 Ill. 2d at 292, quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E.2d 1204 (1993). Unambiguous clauses within insurance contracts must be enforced according to their terms and courts should refrain from adopting interpretations resulting in distortions and creating ambiguities where none exist. *Young v. Allstate Insurance Co.*, 351 Ill. App. 3d 151, 157-58, 812 N.E.2d 741 (2004).

## I. COVERAGE A: BODILY INJURY LIABILITY

Though the policy here contains a maze of provisions that must be navigated in order to determine whether coverage for bodily injury resulting from a fire exists, in the end, the determination hinges upon the kind of business Loop Paper Recycling was running at its Riverdale facility. The policy in this case begins by stating that Connecticut will provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." "Bodily injury" is defined in the policy as an "injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

Under the policy's "total pollution exclusion," however, no coverage exists if the "bodily injury *** would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time."[1] The "total pollution exclusion" contains an exception, which reinstates coverage if the "bodily injury" arises "out of heat, smoke or fumes from a hostile fire." This exception does not apply, however, if "that hostile fire occurred or originated" at a site or location where the insured "handled, stored, disposed, processed or treated waste." The policy states that "waste" includes "material to be recycled, reconditioned, or reclaimed."

The issue here is whether, based upon the allegations contained in the underlying plaintiffs' complaint, the exception to the total pollution exclusion applies, *i.e.*, whether the complaint sufficiently alleged that Loop Paper Recycling was "handling, storing, disposing, process-

---

[1]This exclusion applies only to "those sums that the insured becomes legally obligated to pay as damages." Thus, it would not bar coverage for Loop Paper Recycling's own damages from a fire on its own property, *i.e.*, building damage, lost inventory, etc.

ing or treating *waste*" at its Riverdale facility when the fire occurred. (Emphasis added.) Put another way, if the cardboard that the vandals set fire to qualified as "waste," *i.e.*, "material to be recycled, reconditioned, or reclaimed," under the policy, and if Loop Paper Recycling was involved in handling, storing, disposing, processing or treating that cardboard at its Riverdale facility, the policy's total pollution exclusion would bar coverage. Loop Paper Recycling argues that the allegations in the complaint did not sufficiently state as much and that the circuit court erred in finding that the total pollution exclusion barred coverage. We disagree.

First, the underlying plaintiffs' complaint alleged that Loop Paper Recycling's Riverdale facility was a "paper recycling facility." Specifically, the complaint alleged:

> "Loop Paper *** owns, operates, and manages various paper recycling *facilities* and does business in Cook County, Illinois, including in the City of Riverdale. A fire from burning cardboard that continued for at least three (3) days on said Defendant's Riverdale *facility* causing the release of toxic substances into the environment." (Emphasis added.)

The underlying plaintiffs averred that Loop Paper Recycling's business is owning, operating, and managing various paper recycling "facilities." In describing Loop Paper Recycling's presence in Riverdale, the underlying plaintiffs utilized the same noun that they employed in describing Loop Paper Recycling's general operations: facility. Moreover, the underlying plaintiffs did not distinguish what Loop Paper Recycling did at its Riverdale facility in any way from its general operations.

Second, the underlying plaintiffs alleged that Loop Paper Recycling "conducted its operations and business of gathering, holding, storing, handling, baling, packaging, shipping, and transporting cardboard" at its Riverdale facility. They further alleged that *"cardboard commonly utilized and obtained for recycling* contains additives, adhesives, bonding material, and/or other fixatives as well as vinyl chloride, urea, melamine, phenol formaldehyde, urethanes and acrylics and other substances and *on information and belief, the cardboard present at the Defendant, Loop Paper [Recycling's] facility did contain such materials*." (Emphasis added.) This latter allegation equates cardboard that is "commonly utilized and obtained for recycling" with the cardboard that was present at Loop Paper Recycling's Riverdale facility. If the underlying plaintiffs did not intend to equate the two, this allegation would serve no purpose; why would it be relevant to allege what substances are normally found in "cardboard commonly utilized and obtained for recycling" if the cardboard at Loop Paper Recycling's Riverdale facility was not used and obtained for the same purpose?

Third, of course, is its name: Loop Paper *Recycling*, Inc. Though the underlying plaintiffs' complaint did not explicitly state that Loop Paper's Riverdale facility was a "recycling" facility, the allegations, when read together, certainly point to that conclusion. Under the terms of the policy, therefore, because Loop Paper Recycling was involved in the handling, storage, disposal, processing or treatment of waste at its Riverdale facility, the circuit court properly found that the total pollution exclusion barred coverage.

Loop Paper Recycling relies upon *Mid-Continent Casualty Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418 (Tex. App. 2000), to support its argument that the policy's total pollution exclusion does not bar coverage for the fire at its Riverdale facility. In *Mid-Continent*, an "unintended" fire at a factory that processed scrap tires began in a wire pile and spread to some rubber chips, which produced "huge volumes of thick, black smoke" that permeated the surrounding area. *Mid-Continent*, 16 S.W.3d at 420. Residents of the area around the facility filed suit, alleging "damage and injury that was proximately caused by the inhalation and proximity to the smoke from Defendants' [factory] fire." *Mid-Continent*, 16 S.W.3d at 420.

At the time of the fire, the factory was covered under a general commercial liability policy, which provided coverage for "bodily injury" or "property damage" that resulted from a fire. *Mid-Continent*, 16 S.W.3d at 420. The policy contained a pollution exclusion, stating that coverage was not provided for " ' "bodily injury" or "property damage" arising out of the *** release or escape of pollutants' " " 'at or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste.' " *Mid-Continent*, 16 S.W.3d at 420. The policy also included a "hostile fire" exception to the pollution exclusion, which reinstated coverage unless the fire originated from any premises used by the insured for " 'the handling, storage, disposal, processing, or treatment of waste.' " *Mid-Continent*, 16 S.W.3d at 420. Under the policy, the term "waste" included " 'materials to be recycled, reconditioned or reclaimed.' " *Mid-Continent*, 16 S.W.3d at 424.

The court found that the term "waste," as defined in Merriam-Webster's Collegiate Dictionary, encompassed only unwanted byproducts and, because "[t]he rubber chips and wire from which the fire in this case originated are the desired products of the tire-recycling process" and did "not constitute 'waste' under the policy," held that the factory was covered under the insurance policy. *Mid-Continent*, 16 S.W.3d at 424. We recognize that the policy in *Mid-Continent* contained nearly the same language as the policy in this case. However, we

disagree with both the holding and rationale in *Mid-Continent* for three reasons.

First, the court in *Mid-Continent* ignored the policy's definition of the term "waste," *i.e.*, " 'includes materials to be recycled, reconditioned or reclaimed' " (*Mid-Continent*, 16 S.W.3d at 421), and, instead, resorted to a dictionary to define it. See *Mid-Continent*, 16 S.W.3d at 423-24. It is a basic and fundamental tenet of contract law, however, that even if a contract offers only a limited definition of a term, it must be applied as written. See *Young*, 351 Ill. App. 3d at 157-58 (stating that unambiguous clauses within insurance contracts must be enforced according to their terms and courts should refrain from adopting interpretations resulting in distortions and creating ambiguities where none exist); *Central Illinois Light Co.*, 342 Ill. App. 3d at 950-51 (when construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement).

Like the policy in *Mid-Continent*, the policy here stated that "waste" included materials "to be recycled, reconditioned or reclaimed." Though this definition could have been more detailed, it is a definition nonetheless. We cannot simply ignore the express language of the policy. See *Pipefitters Welfare Educational Fund v. Westchester Fire Insurance Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) (refusing to adopt a "colloquial definition" for the term " 'waste' " because the policy "expressly gives the term a more refined, technical meaning" of "materials to be recycled, reconditioned or reclaimed" (emphasis omitted)); *Mid-Continent*, 16 S.W.3d at 424-26 (Gray, J., dissenting) (taking issue with the majority's interpretation of the term "waste" because "the policy contains a 'definition' of 'waste' by reference to what is included within the meaning of the term"). Because the underlying plaintiffs' complaint alleged that the cardboard set afire at Loop Paper Recycling's Riverdale facility was cardboard "to be recycled, reconditioned or reclaimed," it qualified under the policy's "more refined, technical" definition of "waste." *Pipefitters*, 976 F.2d at 1043; *Mid-Continent*, 16 S.W.3d at 424-26 (Gray, J., dissenting).

Second, the basis for the majority opinion in *Mid-Continent* was that "[t]he rubber chips and wire from which the fire in this case originated [were] the desired products of the tire-recycling process" and, therefore, did not "constitute 'waste' under the policy." *Mid-Continent*, 16 S.W.3d at 424. Because the fodder was not "waste" as defined in the policy, the pollution exclusion did not apply.

Here, the underlying plaintiffs' complaint alleged that what caught fire was "cardboard commonly *utilized* and *obtained* for recycling." (Emphasis added.) Unlike the fodder in *Mid-Continent*, it was not

"end-product" material which caught fire at Loop Paper Recycling's Riverdale facility. It was not bundles of newly recycled cardboard that the vandals set fire to, but rather cardboard that was to be used during, and specifically obtained for the purpose of, recycling. See *Pipefitters*, 976 F.2d at 1043 (rejecting argument that the scrap metal which burned was not "waste" because it was a "saleable and useful product").

Third, what drove the court's holding in *Mid-Continent* was the fear that applying the insurer's definition of "waste" would "render the hostile fire exception *** meaningless." *Mid-Continent*, 16 S.W.3d at 424, citing *American Star Insurance Co. v. Grice*, 121 Wash. 2d 869, 877-78, 854 P.2d 622, 627 (1993). In this same vein, Loop Paper Recycling argues:

> "If the term 'waste' includes useful and valuable products, then liability arising out of the release of pollutants from a hostile fire which breaks out at an insured's premises which manufactures and therefore 'handles' aluminum cans, newspapers, magazines, books, batteries, glass, plastic, or clothing, will never be covered because those materials can be recycled. For example, losses arising out of chemical fumes released during a hostile fire at a newspaper's printing press facility would be excluded, because even if the newspaper company does not recycle the newspaper at the printing facility, its sells the newspapers to readers who do."

Any fear that the hostile fire exception might be rendered "meaningless," however, comes from a basic misunderstanding as to how that exception is applied.

The crux of the determination into whether the hostile fire exception applies is the nature of the insured's activity at the premises where the hostile fire occurs. Under the terms of the policy, any bodily injury or property damage that results from pollution caused by a hostile fire is covered so long as the premises where the fire occurred was not (1) "used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste" or (2) a location "on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, pollutants." It is only when the insured is involved in some sort of waste storage, treatment, processing, or cleanup business at its premises that the hostile fire exception does not apply.[2]

For instance, this policy would have provided coverage for bodily

---

[2]Here, rather than obtaining its own policy, Loop Paper Recycling joined

injury caused by toxic smoke emitted during a building fire, so long as that building was not used in the handling, treatment, storage, etc., of waste. Additionally, in Loop Paper Recycling's example recounted above, the newspaper printing press would be covered because, regardless of the nature of what is produced there, the premises where the fire occurred was neither "used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste" nor a location "on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, pollutants." That newspapers can be and are recycled is irrelevant because the "refined, technical" definition of "waste" under the policy is "material *to be* recycled, reconditioned or reclaimed." (Emphasis added.) It is what the insured actually does with the material at the site, and not what one could do with the material, that makes it "waste" under the policy.

■ In summary, Loop Paper Recycling's policy sets forth a clear and unambiguous, though limited, definition of the term "waste." Because that term includes "materials to be recycled," because the underlying plaintiffs' complaint sufficiently alleged that Loop Paper Recycling was involved in the business of recycling cardboard at its Riverdale facility, and because the effects from the burning of that cardboard were the basis for the underlying plaintiffs' lawsuit against Loop Paper Recycling, the circuit court properly found that the policy's total pollution exclusion barred coverage for the underlying plaintiffs' bodily injuries.

## II. COVERAGE B: PERSONAL INJURY LIABILITY

Loop Paper Recycling next argues that the circuit court erred in finding that the underlying complaint failed to allege a "personal injury" as defined in the policy and that, even if a "personal injury" was alleged, the "absolute pollution exclusion" barred coverage.

Under Coverage B, the policy provided that Connecticut would pay sums that Loop Paper Recycling became legally obligated to pay as "damages because of 'personal injury.' " The policy defined "personal injury" as an "injury, other than 'bodily injury,' arising out of \*\*\* [t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor." Cover-

---

with nine other companies to split the $31,221.34 in premiums paid to Connecticut through Corporate Coverage Company, the entity that initially obtained the policy.

age B's "absolute pollution exclusion," however, bars coverage for a "personal injury" which arises "out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." The policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Even assuming, *arguendo*, that the underlying plaintiffs' complaint sufficiently alleged a "personal injury" as defined in the policy, the absolute pollution exclusion bars any coverage.

In *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 476, 687 N.E.2d 72 (1997), our supreme court wrestled with the seemingly limitless scope of what is commonly known as an "absolute pollution exclusion." In *Koloms*, carbon monoxide was released from a faulty furnace located in a two-story commercial building, saturating the air inside the building. *Koloms*, 177 Ill. 2d at 476. As a result, those present on the premises became ill and filed suit. *Koloms*, 177 Ill. 2d at 476. The insurer of the building denied the insured's tendered defense, arguing that, because carbon monoxide was a pollutant, there was no coverage under the policy's absolute pollution exclusion. *Koloms*, 177 Ill. 2d at 476.

On appeal, the insured argued that the insurer's proffered interpretation of the "absolute pollution exclusion" was too broad. *Koloms*, 177 Ill. 2d at 483-84. Specifically, the insured contended that, based upon the "historical purpose of the exclusion," the scope of the clause was limited to "large scale, environmental contamination" and that it was "intended solely to protect insurers from having to defend and indemnify insureds in connection with governmental clean-up costs." *Koloms*, 177 Ill. 2d at 483-84. The insured argued that "because this case involves personal injuries caused by exposure to materials which do not constitute 'pollution' in the traditional sense of the word, the exclusion does not apply." *Koloms*, 177 Ill. 2d at 484.

The *Koloms* court first noted widespread criticism of the insurance industry's attempt to broadly define what constitutes a "pollutant." See *Koloms*, 177 Ill. 2d at 484. The court cited two examples where a broad reading of that term would lead to the "absurd" result of noncoverage: (1) " 'bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Draino' " and (2) " 'bodily injury caused by an allergic reaction to chlorine in a public pool.' " *Koloms*, 177 Ill. 2d at 484, quoting *Pipefitters*, 976 F.2d at 1043.

After recognizing that, "despite the abundance of opinions construing the exclusion, courts have not reached a clear consensus as to its proper interpretation" (*Koloms*, 177 Ill. 2d at 485) and stating that it was "troubled" by "an overbreadth in the language of the

exclusion as well as the manifestation of an ambiguity which results when the exclusion is applied to cases which have nothing to do with 'pollution' in the conventional, or ordinary, sense of the word" (*Koloms*, 177 Ill. 2d at 488), the court "restricted the exclusion's otherwise potentially limitless application to only those hazards traditionally associated with environmental pollution" (*Koloms*, 177 Ill. 2d at 489).

After extensively recounting the " 'well-documented and relatively uncontroverted [citation]' " (*Koloms*, 177 Ill. 2d at 489) historical events leading up to the insurance industry's adoption of the absolute pollution exclusion (see *Koloms*, 177 Ill. 2d at 489-93), the court determined that the "predominate motivation in drafting an exclusion for pollution-related injuries was the avoidance of the 'enormous expense and exposure resulting from the "explosion" of *environmental* litigation' " (emphasis in original) (*Koloms*, 177 Ill. 2d at 492, quoting *Weaver v. Royal Insurance Co. of America*, 140 N.H. 780, 783, 674 A.2d 975, 977 (1996), quoting *Vantage Development Corp. v. American Environmental Technologies Corp.*, 251 N.J. Super. 516, 525, 598 A.2d 948, 953 (1991)). In other words, the "pollution exclusion has been, and should continue to be, the appropriate means of avoiding ' "the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances *into the environment.*" ' " (Emphasis in original.) *Koloms*, 177 Ill. 2d at 493, quoting *West American Insurance Co. v. Tufco Flooring East, Inc.*, 104 N.C. App. 312, 323, 409 S.E.2d 692, 699 (1991), quoting *Waste Management of Carolinas, Inc. v. Peerless Insurance Co.*, 315 N.C. 688, 698, 340 S.E.2d 374, 381 (1986).

■ Thus, the *Koloms* court found that in order for the absolute pollution exclusion to apply, there must be "traditional environmental pollution" (*Koloms*, 177 Ill. 2d at 493), which includes " 'any "discharge, dispersal, release, or escape" of a pollutant *** into the environment' " (*Koloms*, 177 Ill. 2d at 494, quoting *Tufco*, 104 N.C. App. at 325, 409 S.E.2d at 700). Applying this rule to the facts before it, the court found that, because the exclusion "applies only to those injuries caused by traditional environmental pollution," and because the accidental release of carbon monoxide that is contained inside a building is not a release of pollutants into the environment, the exclusion did not apply to bar coverage. See *Koloms*, 177 Ill. 2d at 494.

After *Koloms*, this court's first foray into the applicability of an absolute pollution exclusion occurred in *Kim v. State Farm Fire & Casualty Co.*, 312 Ill. App. 3d 770, 776, 728 N.E.2d 530 (2000), where a cleaning company argued that its insurer had breached its duty to defend and indemnify after the company settled a lawsuit brought by

the company's landlord for damages resulting from a pollutant which had seeped through the floor into the soil underneath the building. *Kim*, 312 Ill. App. 3d at 772-73. After recounting the rule delineated in *Koloms*, the *Kim* court held the absolute pollution exclusion barred coverage because, unlike in *Koloms*, the "hazardous material was not confined within the cleaning company's building, \*\*\* but was discharged into the soil underneath its dry cleaning and laundry store." *Kim*, 312 Ill. App. 3d at 775. Because the hazardous material had escaped beyond the walls of the insured's building and into the soil below, the court found that "traditional environmental pollution" had occurred. *Kim*, 312 Ill. App. 3d at 775.

Though not explicitly stated in either *Koloms* or *Kim*, a primary factor to consider in determining if an occurrence constitutes "traditional environmental pollution" and, thus, is not covered under an absolute pollution exclusion, rests upon whether the injurious "hazardous material" is confined within the insured's premises or, instead, escapes into "the land, atmosphere, or any watercourse or body of water." Compare *Koloms*, 177 Ill. 2d at 494 (finding that an accidental leak of carbon monoxide from a faulty furnace that was contained within the insured's building did not "constitute the type of environmental pollution contemplated by the clause"), with *Kim*, 332 Ill. App. 3d at 775 (determining that the insured's "discharge of a hazardous material *into the soil* [met] the definition of traditional environmental pollution" (emphasis added)).

Other cases dealing with the absolute pollution exclusion would seem to support this distinction. See *Economy Preferred Insurance Co. v. Grandadam*, 275 Ill. App. 3d 866, 870-71, 656 N.E.2d 787 (1995) (finding, as the first Illinois court to construe an absolute pollution exclusion, that the exclusion barred coverage when the minor son of the insured spilled mercury in the home of a neighbor); *Housing Authority Risk Retention Group, Inc. v. Chicago Housing Authority*, 378 F.3d 596, 606 (7th Cir. 2004) (holding that the absolute pollution exclusion barred coverage for injuries resulting from "hazardous materials that were 'introduced, released and allowed to remain in the environment in Altgeld Gardens by the surrounding industrial plants, abandoned factories, toxic waste dumps, landfills and a Metropolitan Sanitary District plant' [citation], and by PCBs and PAHs that CHA introduced, released, and allowed to remain in the environment of Altgeld Gardens"); *Pipefitters*, 976 F.2d at 1044 (finding that "one could not characterize the discharge *onto land* of 80 gallons of PCB-laden oil as anything but pollution" (emphasis added)); *Guilford Industries Inc. v. Liberty Mutual Insurance Co.*, 688 F. Supp. 792 (D. Me. 1988) (coverage excluded for damages resulting from rupture of oil tanks at textile mill and subsequent contamination of a river).

This distinction becomes even more reasonable when the purpose behind an absolute pollution exclusion is taken into account: " 'to exclude governmental clean up costs' " (*Koloms*, 177 Ill. 2d at 492, quoting *Tufco*, 104 N.C. App. at 324, 409 S.E.2d at 699), and avoid "the 'enormous expense and exposure resulting from the "explosion" of *environmental* litigation' " (emphasis in original) (*Koloms*, 177 Ill. 2d at 492, quoting *Weaver*, 140 N.H. at 783, 674 A.2d at 977, quoting *Vantage Development Corp.*, 251 N.J. Super. at 525, 598 A.2d at 953). A pollutant contained within the premises of the insured, while certainly harmful to those that come in contact with it, does not pose the same threat, both to the public at large and the pocketbooks of insurance companies, that a pollutant released on or into "the land, atmosphere, or any watercourse or body of water" poses. The above-cited cases support the proposition that, for there to be traditional environmental pollution, triggering the absolute pollution exclusion, the pollutant must actually spill beyond the insured's premises and into the environment.

■ Here, the underlying plaintiffs' complaint alleged that the fire burned "for several days sending clouds of smoke into the air and sending highly toxic substances into the air throughout the surrounding neighborhoods." Because the underlying complaint alleged that the hazardous material (toxic smoke containing chemicals emitted from the burning cardboard) was not confined to the Riverdale facility, but, instead, spread to the "surrounding neighborhoods," we find that traditional environmental pollution occurred, *i.e.*, hazardous material discharged into the atmosphere, and that the policy's absolute pollution exclusion barred coverage.

We note that "[the distinction we draw here] *** is by no means scientific, but one must remember that insurance contract interpretation 'is at bottom a practical art.' " *Pipefitters*, 976 F.2d at 1044, quoting *Continental Casualty Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 301 (7th Cir. 1990). Nevertheless, we draw this distinction because we are not satisfied, nor is it helpful, to have a "We-know-it-when-we-see-it" standard for what constitutes traditional environmental pollution.

Furthermore, we do not say that the release of a pollutant that is contained within an insured's *property* cannot constitute traditional environmental pollution. We only hold that, in this case, the release of toxins by the burning cardboard into the neighborhoods surrounding the Riverdale facility constituted traditional environmental pollution.

Thus, the circuit court correctly found that the "absolute pollution exclusion" in Coverage B barred coverage

Affirmed.

GREIMAN and THEIS, JJ., concur.