In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3292

MADISON MUTUAL INSURANCE
COMPANY,

*Plaintiff-Appellant,*

*v.*

DIAMOND STATE INSURANCE
COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-00565 — **J. Phil Gilbert**, *Judge.*

ARGUED JANUARY 10, 2017 — DECIDED MARCH 21, 2017

Before WOOD, *Chief Judge,* and ROVNER and HAMILTON,
*Circuit Judges.*

ROVNER, *Circuit Judge.* Madison Mutual Insurance Com-
pany ("Madison Mutual") brought suit seeking a declaratory
judgment obliging Diamond State Insurance Company

("Diamond State") to defend Geraldine Davidson in a state-court action filed by her former neighbors, Dr. William and Wendy Dribben. Diamond State previously provided professional liability errors and omissions coverage to Davidson in her capacity as a real estate broker and supplied a defense to Davidson in a previous suit alleging certain wrongdoing by Davidson as a broker. Because the new suit repeats certain allegations from the prior suit, Madison Mutual asserts that it both relates back to the earlier action and may potentially involve claims within the coverage provided by Diamond State. The district court rejected these assertions and entered summary judgment in favor of Diamond State. We affirm.

## I.

In 1999, the Dribbens purchased a home from Todd and Sherry Favre on 42 acres in an exclusive four-parcel development known as Heartland Oaks, in Southern Illinois not far from Saint Louis, Missouri. Davidson represented the Favres in that purchase. Davidson had also conceived of and was one of the developers of Heartland Oaks, and she and her husband owned one of the four parcels in the development. At the center of the development is a 30-acre artificial lake (sometimes referred to in the pleadings as the "Large Lake," as a smaller lake was added later), and the dam creating that lake is located on the parcel that the Dribbens purchased. In a 2006 lawsuit filed by the Dribbens against Davidson and the other original owners in the development, the Dribbens alleged that Davidson had failed to disclose that the original owners/developers had never obtained a permit from the Illinois Department of Natural Resources ("IDNR") authorizing the dam. The 2006 suit alleged, *inter alia*, that Davidson's

non-disclosure amounted to fraudulent concealment and consumer fraud. Davidson tendered the suit to Diamond State, which had issued a professional liability errors and omissions policy to her effective from October 2005 through October 2006 and extended by endorsement to November 22, 2007. The Diamond State policy applied to claims made and reported during the policy period and provided coverage for "wrongful acts arising out of the performance of professional services for others." R. 26-1 at 6. The policy defines a "wrongful act" as "any actual or alleged negligent act, error or omission, or 'personal injury'" arising out of the services Davidson provided as a real estate broker. R. 26-1 at 14. Under a reservation of rights, Diamond State agreed to provide Davidson with a defense to the 2006 suit. The two counts asserting claims against Davidson as a real estate broker were eventually severed from the remainder of the 2006 suit and arbitrated in favor of Davidson. R. 26-9, 26-10.

In 2011, the Dribbens filed a second suit, this one against both Davidson and her husband, alleging a pattern of harassment, intimidation, and interference with the Dribbens' property rights by the Davidsons. The wrongful acts attributed to the Davidsons in the prolix first and second amended complaints range from commercially farming their own property and the Dribbens' property (without their consent), in violation of restrictive covenants; polluting the Large Lake with crop runoff; filing lawsuits with the aim of interfering with the Dribbens' easement rights; spreading rumors that Dr. Dribben was a serial killer; posting offensive signs; and stalking and intimidating the Dribben family and their attorneys. The first amended complaint asserted claims for enforce-

ment of covenants, trespass, malicious prosecution, interference with the Dribbens' right to sell their property, intentional and negligent infliction of emotional distress, unjust enrichment, a declaration that there had been no adverse possession of the Dribbens' property, and for an order of protection. The second amended complaint, dated May 2014, added two more claims of trespass (including criminal trespass), three counts seeking to remove clouds upon and quiet title to the Dribbens' property, two counts of nuisance, one count of negligence, and one count seeking to enjoin other neighbors in the development vis-à-vis the disputed easements, for a total of 18 counts.

Davidson tendered the 2011 lawsuit to Madison Mutual, which had provided homeowner's insurance coverage to Davidson and her husband (including personal liability coverage up to $500,000 per occurrence) from July 2004 to July 2011. Madison Mutual had also issued umbrella liability coverage to the Davidsons (with a limit of $1 million per occurrence) from December 2005 to December 2011. Madison Mutual agreed to provide the Davidsons with a defense pursuant to their homeowner's coverage.

Davidson also tendered the first and later the second amended complaints to Diamond State, but on both occasions Diamond State refused to supply her with a defense in the 2011 litigation. Diamond State did not view either complaint as seeking relief for acts arising out of any professional services Mrs. Davidson had provided to others as a real estate broker.

In 2014, Madison Mutual filed this suit in the district court seeking a declaratory judgment to the effect that Diamond State has breached its duty to defend Davidson in the 2011 suit

and bears a duty to reimburse Madison Mutual for the costs it has incurred in supplying a defense to her in that litigation. (Davidson herself is not a party to the suit.) Madison Mutual posits that the factual allegations made in the 2011 suit support a potential claim against Davidson in her capacity as a real estate broker for her failure to disclose to the Dribbens that the dam lacked a permit; Madison Mutual views that potential claim as relating back to the 2006 suit against Dribben, which Diamond State was obligated to (and did) defend.

The district court entered summary judgment in favor of Diamond State, concluding that it has no duty to defend Davidson. In relevant part, the court reasoned the allegations made against the Davidsons in the 2011 suit (which the district court referred to as the "Underlying Litigation") did not support a potential claim against Mrs. Davidson as a broker that in turn might relate back to the 2006 suit (referred to as the "Original Litigation") and trigger a duty to defend on the part of Diamond State.

> Although there are factual statements relating to the dam and the IDNR in the Underlying Litigation, those statements pertain to the allegations of [the] Davidsons' harassment of the Dribbens and not the failure to disclose the requirement for a dam permit which was the issue in the Original Litigation.
>
> The question becomes whether any of the allegations contained in the Underlying Litigation could be deemed as "rising out of the wrongful act" contained in the Original Litigation. There

was a single wrongful act alleged in the Original Litigation—that of Geraldine's failure to disclose that the lake did not have an IDNR permit for the dam.

The fact that Geraldine Davidson was the real estate agent that represented the Favres in the sale of their home to the Dribbens and that she [was] one of the developers of Heartland Oaks—are facts—but the allegations in the Underlying Litigation must arise from the previous *wrongful act*. It could be argued that all of the allegations—both in the Original and Underlying Litigations—arise from Ms. Davidson's actions as a real estate agent in the sale of the property from the Favres to the Dribbens (for if she had not sold them the home, none of these allegations could have occurred), but the sale of the home was not the "wrongful act" alleged in the Original [L]itigation. The "wrongful act" was the failure to disclose the lack of the dam permit.

The failure of Geraldine Davidson to disclose the lack of the dam permit does not extend to the inclusion [of] all problems, omissions, harassment, trespassing, and numerous other allegations contained in the Underlying Litigation. Those allegations stand apart from the initial "wrongful act" and as such, Diamond has no duty to defend.

R. 41 at 11 (emphasis in original).

## II.

As the district court disposed of this case on summary judgment, we review its decision de novo. *E.g.*, *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 718–19 (7th Cir. 2015). This is a diversity action, and the parties agree that we should look to the law of Illinois, the forum state, for the relevant substantive legal principles. *See*, *e.g.*, *Am. Alternative Ins. Corp. v. Metro Paramedic Servs., Inc.*, 829 F.3d 509, 513 (7th Cir. 2016).[1]

An insurer's duty to defend its insured in litigation depends on both the terms of the insurance policy at issue and the nature of the underlying action. The duty to defend is logically broader than the duty to indemnify. *See Cincinnati Ins. Co. v. H.D. Smith, LLC*, 829 F.3d 771, 774 (7th Cir. 2016). Whereas the latter duty requires a claim that actually falls within the scope of coverage, the former duty is triggered by allegations in the underlying litigation that plausibly may fall within the scope of coverage. *See Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 693 (7th Cir. 2009) (discussing *Crum & Forster v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1081 (Ill. 1993)). An insurer therefore cannot refuse to defend unless it is clear that the underlying allegations do not bring the case even potentially within the scope of coverage. *E.g.*, *Panfil*, 799 F.3d at 719 (quoting *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 688 (7th Cir. 2008)). In determining whether the insurer has a duty to

---

[1]  Each of the Seventh Circuit precedents that we cite in this opinon applies Illinois law.

defend, a court applies what is known as the "eight-corners" rule: we compare the four corners of the underlying complaint with the four corners of the policy, according both the complaint and the policy a liberal construction. *Am. Alternative*, 829 F.3d at 513–14 (quoting *Pekin Ins. Co. v. Precision Dose, Inc.*, 968 N.E.2d 664, 674 (Ill. 2012)). In applying this rule, our focus is on what has actually been alleged in the underlying action rather than what hypothetically could be alleged. *Amerisure Mut. Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 812 (7th Cir. 2010) (quoting *Del Monte Fresh Produce N.A., Inc. v. Transport. Ins. Co.*, 500 F.3d 640, 643 (7th Cir. 2007)). If any portion of the complaint in the underlying litigation potentially falls within the coverage provided by the policy, the insurer must defend the entire suit. *Philadelphia Indem. Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 398 (7th Cir. 2014) (collecting cases).

The Diamond State policy is a real estate errors and omissions policy covering claims arising out of the professional services Davidson provided as a real estate broker. So the essential question is whether the allegations in the 2011 litigation potentially implicate Davidson's conduct as a broker. But more than that, because the policy is a "claims made and reported" policy and Diamond State's coverage ended in 2007 (with a corresponding notice period ending early in 2008), the claim nominally must be one that was made against Davidson within the policy period and which was reported to Diamond State no later than 60 days after the end of that period. The 2011 suit, of course, was filed years after Diamond State's coverage terminated, and so at first glance timely reporting of that suit would appear to be out of the question. But Madison Mutual's theory is that the 2011 litigation relates back to the

2006 suit. There is no dispute that Diamond State had timely notice of the 2006 suit (and, in fact, supplied Davidson with a defense in that action). The policy provides that once Diamond State has received timely notice of a "wrongful act" within the policy's scope, "[a]ny claim that may subsequently be made against [the insured] arising out of that wrongful act will be deemed for the purpose of this insurance to have been made on the date [Diamond State] received such [timely] notice." This is referred to by the parties as the "awareness clause" of the policy. Madison Mutual asserts that the 2011 suit, like the 2006 suit, rests in part on an assertion that Davidson breached her professional obligations to the Dribbens by failing to disclose that the dam on the property that the Dribbens purchased was never properly permitted. In that respect, Madison Mutual contends, the 2011 suit arises out of the same wrongful act as the 2006 suit (and potentially asserts a professional misconduct claim of the sort that is covered by the Diamond State policy). And because Diamond State had timely notice of the 2006 suit, under the awareness clause, it may be deemed to have had timely notice of the 2011 suit as well, in Madison Mutual's view.

There are, to be sure, factual allegations in the 2011 suit regarding the dam and Davidson's status as a real estate broker. Thus, the Second Amended Complaint filed in that suit alleges that:

> • Davidson is both a developer (who spearheaded the creation of Heartland Oaks) and a real estate broker. R. 21-9 ¶¶ 18, 25, 48, 51, 521.

• As a broker, Davidson had represented the Favres in the sale of their property to the Dribbens and received a commission for the sale. R. 21-9 ¶ 18.

• The dam for the Large Lake in the Heartland Oaks development resides on the property sold by the Favres to the Dribbens. R. 21-9 ¶ 67.

• Davidson was advised during the construction of the Large Lake that a permit would be needed (although she denies being told this). R. 21-9 ¶ 72.

• Davidson and the other original owners of the Heartland Oaks properties nonetheless decided to forgo obtaining a permit for the dam, in order to spare expense and to avoid future involvement with the IDNR. R. 21-9 ¶ 73.

• After buying into the Heartland Oaks development, the Dribbens were advised by IDNR that because they owned the property on which the dam was located, they were responsible for obtaining a permit. R. 21-9 ¶ 163.

• When the Dribbens sued Davidson for failing to tell them that the dam was not permitted, Davidson in turned filed suit against Mrs. Dribben, alleging that she had slandered Davidson. The slander complaint was based on the charge in the Dribbens' suit that Davidson had committed fraud by not disclosing the lack of a permit, an allegation that purportedly injured

Davidson's reputation as a broker. R. 21-9 ¶¶ 247, 248.

• "As the next door neighbors of the Dribbens, as the owner/real estate broker who sold the Favres' property to the Dribbens, as two of the developers of Heartland Oaks, as two of the signatories to the Restrictions, the Easement Agreement and the Amendment, and because Geraldine Davidson as the realtor for at least the Favres had convinced the Dribbens that Heartland Oaks was a first class development, the Defendants owed the Dribbens a duty of care to act reasonably and to hold themselves to the same standard of care that they have demanded of their neighbors, and to not negligently engage in acts that the Dribbens would perceive as stalking, harassment or intimidation." R. 21-9 ¶ 525.

• "Accordingly, under the above facts, the Defendants owed the Dribbens a duty of care, and they breached that duty of care by engaging in the conduct alleged in this amended complaint. R. 21-9 ¶ 528.

Focusing on these last two allegations regarding a duty of care, Madison Mutual alleges that it is reasonable to infer that said duty includes Mrs. Davidson's duty of care as a realtor and that the alleged breach of that duty includes her failure, in connection with the sale of the Favres' property to the Dribbens, to disclose that no permit had been obtained for the dam.

To make the obvious point first, nowhere in either the first or second amended complaints filed in the 2011 litigation is the allegation made that Davidson breached her professional obligations as a real estate broker by failing to disclose to the Dribbens that the dam lacked a permit. Her status as a real estate broker is noted; the lack of a permit for the dam is also noted; and for that matter, the Dribbens' 2006 suit against Davidson over her failure to disclose the lack of a permit is noted. But there is no allegation, express or implied, that Davidson wronged the Dribbens in her capacity as a realtor by not disclosing that the dam was un-permitted.

The complaint overall is one about Mr. and Mrs. Davidson's pattern of alleged acts—as neighboring landowners—that have interfered with the Dribbens' ability to use, enjoy, and sell their own property. The allegations on which Madison Mutual has focused are but a few of the many hundreds of allegations set forth in an effort to establish why and how the Davidsons made living in the Heartland Oaks development a misery for the Dribbens.[2]

To be sure, there are references in the final two paragraphs of the list set out above to a duty of care that the Davidsons owed to the Dribbens stemming in part from Mrs. Davidson's role as the realtor who brokered the sale of the Favre property to the Dribbens. These are the references that Madison Mutual

---

[2] Even the Dribbens' 2006 suit for failure to disclose the lack of a dam permit is referenced only as the triggering event for the slander suit that Davidson filed against Mrs. Dribben, and the slander suit in turn is noted as one component of the general pattern of harassment alleged by the Dribbens.

principally relies on to support the notion that the litigation plausibly might assert a claim against Mrs. Davidson based on her failure to make full disclosure with respect to the dam. But the relevant language of the second amended complaint, which we have quoted verbatim, makes clear that the duty at issue is not a professional duty that Mrs. Davidson bears as a realtor, but a duty of care that both Mr. and Mrs. Davidson share "to act reasonably and to hold themselves to the same standard of care that they have demanded of their neighbors, and to not negligently engage in acts that the Dribbens would perceive as stalking, harassment or intimidation." R. 21-9 ¶ 525. Read in this context, the reference to Mrs. Davidson's status as a realtor appears aimed at suggesting that she, better than anyone, should have understood how her actions as the Dribbens' neighbor would interfere with the quiet enjoyment of their rights as property owners. Beyond this, there is no allegation that Mrs. Davidson was providing professional services to the Dribbens and breached any duty that she may have owed them in that regard.

What we are left with, then, is a small subset of factual allegations that overlap with the factual underpinnings of the 2006 suit regarding the dam permit, but no allegation of injury resulting from Mrs. Davidson's failure to disclose the lack of the permit to the Dribbens and no theory of recovery predicated on that failure. Madison Mutual nonetheless asserts that because this subset of alleged facts could support a claim related to her alleged failure to disclose, we should construe the 2011 litigation as potentially asserting such a claim against Davidson in her capacity as a realtor and hold that Diamond State has a duty to defend Davidson in the later suit.

Our decision in *Health Care Indus. Liability Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, *supra*, 566 F.3d 689, makes clear why Madison Mutual's reasoning is faulty in this respect. *Momence Meadows* was a duty-to-defend case in which the underlying suit was one brought by former employees of a nursing home seeking recompense for exposing fraudulent charges that the nursing home had submitted to Medicare and Medicaid—i.e., claims for services that did not meet professionally recognized standards for health care. Each of the claims asserted in their complaint was premised either on the submission of claims falsely certifying that the services provided by the nursing home complied with the requisite standard of care (and the employees' role in exposing the fraud) or the nursing home's alleged retaliation against the employees for blowing the whistle on the fraud. None of the claims, as framed, fell within the scope of coverage provided by the nursing home's liability carrier. But the nursing home pointed to factual allegations in the underlying complaint describing the physical harms the home's residents had suffered as a result of the substandard care they had received. Those injuries, the nursing home argued, would support potential claims for bodily injury and malpractice under the home's liability coverage, even though no such claims had been asserted thus far. In rejecting this argument, we emphasized first that the factual allegations, although they "put a human touch on the otherwise administrative act of false billing," were not necessary to the types of statutory claims the plaintiffs in the underlying litigation were actually pursuing. *Id.* at 695. And in response to the nursing home's contention that the factual allegations of the underlying

complaint, rather than particular legal theory alleged, control, we stated:

> Momence is correct that the factual allegations in the complaint, and not the legal labels a plaintiff uses, control. But factual allegations are only important insofar as they point to a theory of recovery. And it is impossible to construe the underlying complaint as raising any theory of recovery based on bodily injury. …

566 F.3d at 696 (citations omitted). Likewise here, the factual allegations concerning the dam, the lack of a permit, and Davidson's role in selling the property to the Dribbens, while they may provide explanatory background for the Davidsons' alleged acts of harassment (including the slander suit), do not point to any theory of recovery against Davidson for breach of her professional obligations as a realtor.

Still, Madison Mutual contends that a catch-all request in the Dribbens' prayer for relief for "[a]ny other further relief that the Court feels is necessary, proper or just" (R. 21-9, Request for Relief ¶ S) leaves the door open to theories their complaint does not otherwise assert. But this type of boiler-plate request does not operate as an independent request for relief, let alone an independent theory of recovery not otherwise factually supported in the body of the complaint. *See Employers Ins. Co. of Wausau v. Bodi-Wachs Aviation Ins. Agency, Inc.*, 846 F. Supp. 677, 686 (N.D. Ill 1994); *Penn. Cnty. Risk Pool v. Northland Ins.*, No. 1:07-cv-00898, 2009 WL 506369, at *9 (M.D. Pa. Feb. 27, 2009); *XXL of Ohio, Inc. v. City of Broadview Hts.*, 341 F. Supp. 2d 825, 841 (N.D. Oh. 2004).

Madison Mutual alternatively suggests that because the Dribbens, by their own account, would never have purchased property in the Heartland Oaks development and become the Davidsons' neighbors had Davidson disclosed that the dam lacked a permit, her failure to disclose as alleged in the 2006 suit was a but-for cause of the claims raised in the 2011 suit. Granted, had the Dribbens never purchased the property, they would have no reason to complain about the Davidsons' actions as neighbors. In the very broadest factual sense, then, the wrongs alleged in the 2011 litigation might be said to arise from the wrongs alleged in the 2006 suit. But that does not transform what is otherwise a suit about the Davidsons' actions as the Dribbens' neighbors into a suit about Mrs. Davidson's prior actions as the broker who sold them the property. *See James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 386 (7th Cir. 2009) (noting the logical limits as to what may be said to arise from a particular event in assessing an insurer's duty to defend).

For all of these reasons, the 2011 suit does not assert, or potentially assert, a claim that is plausibly within the professional liability coverage that Diamond State provided to Davidson. Diamond State has no duty to defend her in the 2011 litigation.

In view of this conclusion, we have no need to reach the policy exclusions set forth in the Diamond State policy and whether they might independently operate to relieve Diamond State of any duty to defend Davidson.

## III.

For the reasons discussed, we AFFIRM the district court's judgment.